# IN THE SUPREME COURT OF IOWA

No. 06–0476

Filed October 31, 2008

**STATE OF IOWA**,

Appellee,

vs.

**ROGER PAUL BENTLEY**,

Appellant.

Appeal from the Iowa District Court for Johnson County, Patrick R. Grady, Judge.

Defendant appeals jury verdicts of first-degree murder and first-degree kidnapping. **AFFIRMED.**

Mark C. Smith, State Appellate Defender, and Theresa R. Wilson, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Darrel L. Mullins, Assistant Attorney General, and Janet M. Lyness, County Attorney, for appellee.

**CADY, Justice.**

In this direct appeal from a judgment and sentence of first-degree kidnapping and first-degree murder, we review a variety of claims of trial and sentencing errors. Upon our consideration of the appeal, we decline to address one claim of ineffective assistance of counsel and reject all other claims of error. We affirm the judgment and sentence of the district court.

## I. Background Facts and Proceedings.

J.G. was ten years of age when her life ended as a victim of murder. The detailed events of her death are chronicled in this opinion in order to properly address the issues raised in this appeal from the trial where they were recounted by witnesses and memorialized as evidence. We use the initials of the name of the victim to identify her in this opinion in an effort to protect her memory from the brutal actions that accompanied her death. *See* Iowa Code § 915.36(2) (2007).

J.G. lived with her grandmother, mother, and two younger siblings in her grandmother's two-story home in Cedar Rapids. J.G. was the oldest child and maintained a bedroom in the basement of the home. She attended a local grade school and was fond of wearing her "Chicago Bears" jacket.

On the morning of March 25, 2005, police found J.G.'s lifeless body in a filthy and deserted trailer home located on the Orval Yoder Turnpike outside Cedar Rapids, several miles from her home. Her body was inhumanely wedged into a bathroom vanity in the trailer home. She had been brutally beaten, sexually abused, bound in plastic and wrapped in duct tape. A plastic bag had been placed over her head and wrapped with six rotations of tape around her neck. The cause of her

death was determined to be asphyxiation from the plastic bag and compression to the neck and chest.

Roger Bentley was, ostensibly, a friend of J.G.'s family. On the morning of March 24, 2005, the day before the grisly discovery of the body of J.G., Bentley was at J.G.'s home for the purpose of making repairs to the family van. Bentley worked outside the house on the van for most of the day, but came into the house from time to time to warm his body, especially as evening descended on the day. He stopped working on the van at 7:30 p.m. and entered the house for the last time. He went into the living room, sat down and engaged in conversation with J.G.'s grandmother and the three children. J.G.'s mother was not at home.

At 8 p.m., J.G.'s grandmother announced it was time for the three children to go to bed. J.G. went downstairs to her bedroom by herself as directed by her grandmother. The grandmother took the two younger children to their upstairs bedroom and put them into bed. Bentley accompanied J.G.'s grandmother and the two children up the stairs and told the two children goodnight.

Bentley then left the house. However, the precise movements of his departure are somewhat shrouded by the grandmother's inability to clearly articulate the events. Her testimony at trial permitted the State to assert that Bentley left the house while she was still upstairs with the two younger children.[1] Bentley claims her testimony can be viewed to mean she showed him to the front door and locked the door behind him as he left the house. Bentley did not testify at trial.

---

[1]J.G.'s grandmother testified: "Well, he went and said good night to—when I put [J.G.'s sister] to bed, he said good night. And when I put [J.G.'s brother] to bed, he said good night. And then he went around to the front door and then—it was about 8:00 and then he left. Then I went down and locked the door."

Under either view, J.G.'s grandmother locked the front door after Bentley left the house. She later went downstairs to check on J.G. She did not find J.G. in her bed. The fear she sensed intensified, as she was unable to find J.G. in or around the house. She telephoned J.G.'s mother and then the police. The police issued an AMBER alert[2] and sought to locate Bentley.

Between 10:45 p.m. and 11 p.m. that evening, a motorist pulled to the side of the road and stopped after he was flagged down by Bentley. Bentley was in a pickup truck with a topper over the bed of the truck. Bentley asked the motorist for directions to Black Diamond Road. This road accesses Orval Yoder Turnpike. The motorist provided directions to Bentley, but did not observe anyone in the cab of the truck with Bentley. The topper had tinted windows, which did not allow the motorist to view the truck bed.

The next morning, Robin Walker and Danny Hill were home getting ready for work. They heard the AMBER alert on the morning news broadcast. The alert announced J.G. was missing and that police were looking for Bentley. Walker and Hill were almost immediately overcome with suspicion that Bentley may have taken J.G. to the trailer on Orval Yoder Turnpike. Bentley occasionally did automobile repair work for them, and he had accompanied Walker and Hill to the trailer three days earlier. Walker and Hill were interested in purchasing the trailer. They promptly called police about their prophetic feeling.

A short time later, law enforcement officers converged on the trailer. Bentley emerged from the rear door of the trailer and was taken

---

[2]"The AMBER alert program is a cooperative effort of the department of public safety, the department of transportation, the lottery authority, the Iowa association of broadcasters, the Iowa state association of sheriffs and deputies, local law enforcement agencies, and the national weather service." Iowa Admin. Code r. 661—89.200 (2003).

into custody. Officers observed that he was "scruffy," "unkempt," and "unshaven." He was wearing jeans with blood on the fabric in the area of the front zipper.

Officers entered the trailer. They found it in a general state of disarray. In a bedroom, a youth-sized "Chicago Bears" jacket was observed, along with a child's pink tennis shoe. Officers also observed a substance later determined to be blood on the mattress in the bedroom.

Officers called out for J.G., with no response. A hurried search by the officers of the other rooms of the trailer failed to reveal her presence. The officers did observe a filing cabinet and a large piece of wood positioned in front of the vanity in the bathroom.

A canine unit was summoned to the trailer to search for J.G. After an unsuccessful search of the wooded area surrounding the trailer, the dog and his handler went into the trailer. Within a short period of time, the dog alerted to the area of the vanity under the sink in the bathroom. The officers removed the debris in front of the vanity and opened the vanity door located below the sink. The search had come to an end.

J.G.'s body was cool to the touch. Lividity had set in. The officer who opened the vanity door observed blood in the area of J.G.'s exposed lower back and buttocks.

State criminologists were summoned to the trailer. They removed J.G.'s body from the vanity. A plastic garment bag had been taped tightly around her neck. Her feet were also wrapped with plastic and bound with tape. The criminologists found blood on the bedding in the bedroom, as well as on the walls and doorjamb of the bedroom. The blood was later determined to be from J.G.

An autopsy of J.G.'s body revealed bruising to the deep tissue of her neck, blunt-force trauma to the side of her head, and less severe

bruising to the face, abdomen, shoulder, back, arms, and legs. Petechial hemorrhaging was present in her eyes, face, heart, and lungs. A frothy substance was found in her larynx. These findings supported a cause of death by asphyxiation from the plastic bag and compression to the neck and chest.

The autopsy also discovered seminal fluid in J.G.'s vagina and anus. DNA from the fluid was tested and matched the DNA collected from Bentley.

Criminologists additionally analyzed scraping from Bentley's fingernails. The analysis found blood containing DNA from J.G. Blood was also found on Bentley's underwear, shirt, and fly area of his pants. This blood contained DNA from J.G. The "Chicago Bears" jacket and shoe were confirmed to belong to J.G.

Bentley was charged and found guilty following a jury trial of first-degree kidnapping and first-degree murder. The district court sentenced Bentley to two consecutive life sentences. It indicated consecutive sentences were justified based on the violent and cruel nature of the criminal acts and to send a message to the parole board and governor that any future application for commutation of sentence "should not be taken seriously."

Bentley appealed and raised three issues. He first claims there was insufficient evidence to support a finding that he was the person who removed or confined J.G. to support the conviction for first-degree kidnapping. Second, he claims his trial court counsel rendered ineffective assistance in two ways. The first component of the claim is his trial lawyer should have requested a new trial based on jury misconduct after it was discovered that a juror used a dictionary to ascertain the definition of the word "necromancy" and went on-line to

Amazon.com to search for a book titled "The Necromantic Ritual Book." A copy of this book was found at Bentley's house and was introduced into evidence at trial. The second component of the claim of ineffective assistance of counsel was based on the failure of Bentley's trial counsel to object to the malice-aforethought instruction given by the trial court to the jury. Bentley claims the instruction permitted the jury to convict him without adequate proof of malice aforethought. Finally, Bentley claims the district court used an improper reason to impose consecutive sentences.

## II. Standards of Review.

The principles governing our review of a district court's denial of a criminal defendant's motion for judgment of acquittal are well-established. *State v. Henderson*, 696 N.W.2d 5, 7 (Iowa 2005). A motion for judgment of acquittal is a means of challenging the sufficiency of the evidence, and we review such claims for correction of errors at law. *Id.* A guilty verdict must be supported by substantial evidence. *Id.*

> " 'Substantial evidence' is that upon which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." In conducting our review, we consider all the evidence, that which detracts from the verdict, as well as that supporting the verdict. We view the evidence in the light most favorable to the State.

*State v. Hagedorn*, 679 N.W.2d 666, 668–69 (Iowa 2004) (quoting *State v. Pace*, 602 N.W.2d 764, 768 (Iowa 1999)) (citations omitted).

"[T]he decision of the district court to impose a particular sentence within the statutory limits is cloaked with a strong presumption in its favor, and will only be overturned for an abuse of discretion or the consideration of inappropriate matters." *State v. Formaro*, 638 N.W.2d 720, 724 (Iowa 2002). Abuse of discretion occurs only when "the

decision was exercised on grounds or for reasons that were clearly untenable or unreasonable." *Id.*

We review ineffective-assistance-of-counsel claims de novo. *State v. Horness*, 600 N.W.2d 294, 297 (Iowa 1999).

**III. Sufficiency of the Evidence to Support First-Degree Kidnapping.**

A key element of kidnapping in the first degree requires the defendant to remove the victim from one place to another or confine the victim. Iowa Code § 710.1 (2003). Bentley argues there was no substantial evidence presented by the State to support a guilty verdict on the element of the crime that Bentley removed J.G. from one place to another.[3]

The crux of Bentley's argument is that no direct evidence was presented at trial to demonstrate he abducted J.G. and drove her to the trailer. The State acknowledges the lack of direct evidence of an abduction, but contends sufficient circumstantial evidence was presented at trial to support a verdict based on removal of J.G. from one place to another. We agree.

As with a great bulk of the jurisdictions around the country, we follow a rule that direct and circumstantial evidence are equally probative for the "purposes of proving guilt beyond a reasonable doubt." *State v. O'Connell*, 275 N.W.2d 197, 205 (Iowa 1979). Additionally,

> [w]hile a jury may not rely upon evidence that merely creates speculation, suspicion or conjecture, it may utilize all of the direct and circumstantial evidence, and the inferences from that evidence, in determining whether or not the required removal or confinement is proven.

---

[3]Bentley also argues the State failed to prove beyond a reasonable doubt that Bentley did not have consent to remove J.G. In his reply brief, however, Bentley concedes this argument was not preserved for appellate review.

*State v. Hatter*, 414 N.W.2d 333, 338 (Iowa 1987) (citation omitted). Moreover, the prosecution does not have "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 326, 99 S. Ct. 2781, 2792–93, 61 L. Ed. 2d 560, 578 (1979) (affirming murder conviction relying exclusively on circumstantial evidence to prove intent element); *accord Holland v. United States*, 348 U.S. 121, 139–40, 75 S. Ct. 127, 137, 99 L. Ed. 150, 166 (1954) (rejecting an instruction requiring that when the state's evidence is circumstantial the state must disprove every reasonable hypothesis other than guilt).

The State concedes the paucity of direct evidence that Bentley removed J.G. from the house. Yet, there was ample circumstantial evidence to support a finding that he removed J.G. from her home. On the night J.G. disappeared, she went to her bedroom in her house to go to sleep. Bentley was at the house at the time and left a short time later. The only other known occupants of the house were J.G.'s grandmother and J.G.'s two younger siblings. There was no evidence of a forced entry into the house. There was evidence Bentley left the house unobserved while J.G.'s grandmother was upstairs with the younger siblings. A short time after Bentley left, the grandmother discovered J.G. was missing. Considering J.G.'s youthful age, she would not have been able to transport herself to the deserted trailer where she was found. Approximately two hours after Bentley left the house, he asked for directions to a road that accessed the road where the trailer was located. The next morning, Bentley was found in the trailer. Parts of the trailer were smeared with J.G.'s blood, and J.G.'s bloody clothes were found inside the trailer. Her body was also found. Her DNA was found under

Bentley's fingernails and on his clothes. Bentley's sperm was found inside J.G.'s body.

While the absence of direct evidence that Bentley abducted J.G. from her house means the prosecution cannot affirmatively disprove the hypothesis that someone other than Bentley removed J.G. to the trailer, the State is not tasked with such an onerous burden. *E.g., Jackson*, 443 U.S. at 326, 99 S. Ct. at 2792–93, 61 L. Ed. 2d at 578. Instead, the State is required to prove beyond a reasonable doubt that Bentley removed J.G. A reasonable jury could have found beyond a reasonable doubt Bentley left the house with J.G. while J.G.'s grandmother was upstairs and drove to the trailer with J.G. in his truck. While other conflicting scenarios can be postulated, a court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326, 99 S. Ct. at 2793, 61 L. Ed. 2d at 578.

A guilty verdict based on a removal theory is supported by substantial evidence in the record. Consequently, we need not address Bentley's legal argument addressing the propriety of the general kidnapping verdict.[4] The first-degree kidnapping verdict is affirmed.

## IV. Ineffective Assistance of Counsel.

Bentley argues his trial counsel was ineffective in two ways. To establish either ineffective-assistance-of-counsel claim, Bentley must satisfy the well-settled two-prong test requiring (1) the failure by counsel

---

[4]Bentley argues the general guilty verdict on the kidnapping count cannot stand. He argues there is no way of knowing whether he was convicted on the arguably unsupported removal theory—meaning the possibility exists that he was convicted on some quantum of evidence less than the constitutionally mandated proof beyond a reasonable doubt. Again, this is a nonissue because the removal theory was supported by ample circumstantial evidence.

to perform an essential duty, and (2) resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674, 693 (1984).

> [C]laims of ineffective assistance of counsel raised on direct appeal are ordinarily reserved for postconviction proceedings to allow full development of the facts surrounding counsel's conduct. Only in rare cases will the trial record alone be sufficient to resolve the claim.

*State v. Atley*, 564 N.W.2d 817, 833 (Iowa 1997) (citation omitted). "Even a lawyer is entitled to his day in court, especially when his professional reputation is impugned." *State v. Coil*, 264 N.W.2d 293, 296 (Iowa 1978).

**A. Juror Misconduct.** Bentley first claims ineffective assistance of counsel premised on the failure of his trial attorney to seek a new trial based on jury misconduct. After sentencing, but before filing his appeal, Bentley learned through an investigator that one of the jurors performed research outside of the record. Specifically, the juror used a dictionary to determine the meaning of the word "necromancy" and searched for "The Necromantic Ritual Book"—which was introduced at trial—on Amazon.com.[5]

Bentley argues his counsel's failure to move for a new trial based on the juror's conduct amounts to ineffective assistance of counsel. He acknowledges in his brief, however, that the record needs to be further developed and that his claim should be preserved for postconviction relief. Bentley asks us to explicitly preserve this ineffective-assistance-of-counsel claim.

---

[5]Necromancy is defined as "1a(1): the art or practice of magically revealing the future, of magically influencing the course of natural events, or of magically attaining other purposes esp. through communication with and intervention of the dead (2): the art or practice of magically conjuring up the souls of the dead b: magic in general esp. when directed toward attainment of evil purposes: WITCHCRAFT, SORCERY." Webster's Third New International Dictionary 1511 (unabr. ed. 2002).

Iowa Code section 814.7(1) relieves defendants from the necessity of raising ineffective-assistance-of-counsel claims on direct appeal. Instead, the claims are preserved for postconviction relief proceedings by operation of law. When an ineffective-assistance-of-counsel claim is raised on direct appeal, Iowa Code section 814.7(3) provides appellate courts with the option to decide the claim upon an adequate record or allow the claim to be brought in a postconviction proceeding so that a proper record can be made.

The ineffective-assistance-of-counsel claim in this case is the type that normally requires additional record to properly decide. Our prior cases addressing claims of jury misconduct based on the acquisition of outside information demonstrate the importance of understanding the specific background facts to properly apply the law. *See State v. Arnold*, 543 N.W.2d 600, 604–05 (Iowa 1996) (stating the three elements that must be proven to impeach a verdict on the basis of juror misconduct); *Iowa-Illinois Gas & Elec. Co. v. Black & Veatch*, 497 N.W.2d 821, 828–29 (Iowa 1993) (same). Based on the necessity of a more developed record, and on Bentley's acknowledgment that the record is inadequate to decide this issue, we decline to address the claim on direct appeal.

**B. Malice Aforethought.** Bentley next claims his counsel was ineffective in failing to object to the jury instruction on malice. He claims the instruction failed to properly define malice aforethought, and this deficiency permitted the jury to convict him without adequate proof that he asphyxiated J.G. with malice formed before engaging in the criminal act. The State contends the instruction was legally sufficient, and even if it was not, any infirmity did not prejudice Bentley.

Malice aforethought is an essential element of first-degree murder. Iowa Code § 707.1 ("A person who kills another person with malice

aforethought either express or implied commits murder."). The district court included this element in its charging instruction to the jury and further instructed the jury as follows:

> "Malice" is a state of mind which leads one to intentionally do a wrongful act to the injury of another out of actual hatred, or with an evil or unlawful purpose.
>
> Malice may be established by evidence of actual hatred, or by proof of a deliberate or fixed intent to do injury.
>
> Malice may be found from the act and conduct of the defendant, and the means used in doing the wrongful and injurious act.

Bentley contends the court erred in not including the following language found in the instructions published by the Iowa State Bar Association:

> Malice requires only such deliberation that would make a person appreciate and understand the nature of the act and its consequences, as distinguished from an act done in the heat of passion.
>
> "Malice aforethought" is a fixed purpose or design to do some physical harm to another which exists before the act is committed. It does not have to exist for any particular length of time.

I Iowa Crim. Jury Instruction 700.7 (2006). He asserts the omission of the definition of "malice aforethought" allowed the jury to convict him without finding he had malice before the act causing J.G.'s death. The State argues the instructions, read as a whole, adequately explain that Bentley was required to act with malice aforethought.

Our law provides that malice to support a conviction for first-degree murder must be "formed before and continue[] to exist at the time of the injury." *State v. Hofer*, 238 Iowa 820, 833, 28 N.W.2d 475, 482 (1947). This statement captures the essential meaning of the "aforethought" component of the malice requirement. Importantly, "[t]he relationship that must be shown between the state of mind that is malice aforethought and the homicidal act is more accurately characterized as a

causal relationship than as a temporal relationship." *State v. Lee*, 494 N.W.2d 706, 707 (Iowa 1993). In other words, the malice must result in the homicidal act. This concept is the critical aspect expressed by "malice aforethought."

In this case, the instruction given by the district court explained that malice "is a state of mind which *leads one to* intentionally do a wrongful act." (Emphasis added.) Although the instruction did not specifically define malice aforethought, it clearly informed the jury that malice was required to exist before the wrongful act was committed that caused J.G.'s death and led Bentley to commit the act. In fact, courts in other jurisdictions have determined that malice and malice aforethought are not legally distinguishable. *See, e.g., State v. Enno*, 807 P.2d 610, 622 (Idaho 1991) ("There is no legal distinction between malice and malice aforethought."). In light of the instruction given, we conclude the district court was not required to specifically define the term "malice aforethought." The instruction given by the district court informed the jury that the presence of malice had to lead Bentley to intentionally do the act that resulted in J.G.'s death.

**V. Sentence.**

Bentley next claims the trial court considered an inappropriate factor in sentencing him to consecutive life sentences. At the sentencing hearing and again in the written judgment, the trial court expressed its reasons for ordering consecutive life sentences. The two statements were substantially the same, and included:

> [T]he nature of the acts, the fact that these were different acts of violence that involve their own level of cruelty and that this be a signal to any future parole board or governor that any application of commutation should not be taken seriously.

Bentley asserts it was error for the trial court to impose consecutive sentences as a signal to a future parole board and governor. The State argues it is common and proper for a sentencing court to utilize sentencing to send a message to others.

Generally, courts may consider a variety of factors to justify the imposition of a sentence, including rehabilitation of the defendant, protection of the community from further offenses by the defendant and others, Iowa Code § 901.5, the defendant's age and criminal history, the defendant's employment and family circumstances, the nature of the offense, and "such other factors as are appropriate." Iowa Code § 907.5. Yet, we have also held a number of factors are not appropriate for consideration. One inappropriate factor involves the consideration of parole in sentencing. We have said a sentencing court impermissibly invades the prerogative of the parole board by considering the effect a sentence will have on a defendant's parole date. *State v. Remmers*, 259 N.W.2d 779, 785 (Iowa 1977); *see also State v. Thomas*, 520 N.W.2d 311, 313 (Iowa Ct. App. 1994). Thus, a sentencing court may not impose "consecutive sentences to thwart a perceived risk of early parole." *State v. Hulbert*, 481 N.W.2d 329, 335 (Iowa 1992). Bentley seizes on this inappropriate factor by aligning it with the comments made by the sentencing court in this case.

The analogy made by Bentley is not well taken. Bentley is not eligible for parole, only commutation of sentence. Unlike parole, the date a person is eligible for commutation of sentence is independent of the length of the sentence imposed. *See* Iowa Code § 902.2; Iowa Admin. Code r. 205—14.3(1). Thus, the consecutive sentences imposed in this case do not affect the capacity of the board of parole to review a commutation application or the power of the governor to convert a life

sentence into a term of years. *See* Iowa Const. art. IV, § 16 (conferring power of commutation on governor); Iowa Code § 914.1 (stating governor's power shall not be impaired). Accordingly, the message broadcasted by the sentencing court in this case is not improper because it does not bind or limit the board of parole or the governor in any future consideration of commutation of the sentences.

Moreover, sentences imposed by courts in criminal cases necessarily send messages, whether direct or subtle, to those who read or otherwise learn of the sentence. *See State v. Pappas*, 337 N.W.2d 490, 494 (Iowa 1983) (involving perjury and theft by a lawyer and sending messages to lawyers and public that dishonesty in the legal profession will not be tolerated); *State v. Farnum*, 397 N.W.2d 744, 750 (Iowa 1986) (involving sexual abuse and sending a message to the defendant and others in the community that such conduct will not be tolerated); *see also* Iowa Code § 901.5 (allowing courts to consider the need "for the protection of the community from further offenses by the defendant and others"). Thus, Bentley's objection boils down to the propriety of the specific target of the message identified by the sentencing court in this case. However, a targeted message is merely a means to improve the effectiveness of communicating the message. As long as the message itself is not improper, as in this case, it is not improper to direct the message to a specific individual or group.

**VI. Conclusion.**

We affirm the judgment and sentences for first-degree kidnapping and first-degree murder.

**AFFIRMED.**

All justices concur except Baker, J., who takes no part.