# IN THE COURT OF APPEALS OF IOWA

No. 14-1479
Filed October 14, 2015

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**MATHEW JOHN IRVING,**
        Defendant-Appellant.
_____


        Appeal from the Iowa District Court for Marshall County, James C.
Ellefson, Judge.


        Mathew Irving appeals his conviction for murder in the second degree.
**AFFIRMED.**


        Mark C. Smith, State Appellate Defender, and Theresa R. Wilson,
Assistant Appellate Defender, for appellant.

        Thomas J. Miller, Attorney General, Linda J. Hines, Assistant Attorney
General, Jennifer Miller, County Attorney, and Laura Roan, Assistant County
Attorney, for appellee.


        Heard by Doyle, P.J., Bower, J., and Miller, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2015).

**DOYLE, Presiding Judge.**

Mathew Irving appeals his conviction for murder in the second degree for the death of his friend, Rebecca Hall. He contends his trial counsel[1] was ineffective in numerous respects, and if his counsel's errors were not individually prejudicial, the cumulative effect of the errors denied him a fair trial. We affirm.

### I. Background Facts and Proceedings.

From the evidence presented at trial, a reasonable juror could have found the following facts. In the early morning hours of July 14, 2013, Hall was found dead by law enforcement officials in the back of her sister's van.

The officers went to Hall's sister's home and talked to her sister. Shortly after arriving, Shawn Irving, Mathew Irving's wife, stopped by. Shawn was "kind of hysterically . . . cry[ing]," saying, "Tell me it's not so." The officers, in the general information-gathering stage of their investigation, requested Shawn come to the sheriff's office for an interview later, and Shawn agreed.

Shawn was subsequently interviewed. During Shawn's interview, the officers learned Hall and Shawn had been friends but had recently had "a falling out or some animosity going on between them about some rumors that Shawn . . . felt that [Hall] . . . was spreading about [Shawn and Mathew]." Specifically, Shawn learned Hall had told persons, including Mathew, that Shawn was cheating on Mathew with another man. Officers interviewed the other man, and he told them Mathew had confronted him, that Mathew "was upset and . . . made a statement that he'd throw [Hall] in the river."

---

[1] Although Mathew had two attorneys at trial, we collectively refer to both in the singular as "trial counsel."

On July 15, officers interviewed Mathew, and the interview was video-recorded and played for the jury. During this almost two-hour interview, Mathew told the officers he did not see Hall on the evening of July 14, and he did not know what had happened to her. Mathew told them that after he got home from work around 4:30 p.m., he went and got gas, went to a town festival by himself, and got back home around 6:30-7:00 p.m. Shawn was at her mother's house. Mathew told them he sat there for a while, and later that night, he went out to buy cigarettes, driving his wife's truck. He stated that while he was driving, the truck started having issues; it was running poorly and would not stay running. Though he is a mechanic, Mathew told the officers he was not sure what the issue was and his description of the problem was vague. He said he talked to his wife on his cell phone about the truck issue, but he was ultimately able to drive the truck home. Shawn got home around 11:00 p.m., and he and Shawn left and went to a casino. He told them they left the casino around dawn, and he went home and slept. Despite employment of intensive investigative techniques, Mathew repeatedly stated he did not know what happened to Hall.

The next day, Mathew's aunt called the sheriff's office requesting to speak to someone involved with the investigation. An officer called her back, and after speaking to her for a few minutes, she gave her phone to Mathew. Mathew talked to the officer and ultimately told him that on the evening of July 13, he decided to walk over to Hall's house while his wife was at her mother's house, on the off chance that Hall might be home. He told the officer he wanted to confront Hall "about all the things she was saying." Mathew stated he found Hall at home in her garage, and she asked him if he wanted to go for a ride in the van. He

said he agreed, and she drove them to a park and parked the van. Mathew told the officer that when they got there, Hall "informed him that she wanted to perform oral sex on him, and . . . he said okay," and Hall then got in the back of the van and took off all of her clothes. She began performing oral sex on him, but he was not becoming aroused. He told Hall this, and Hall "just freaked out," and "she replied back something to the effect of, 'Am I not good enough for you,' and maybe another phrase," and she started smacking him. Mathew told the officer

> he was holding her down, and [had his] hands on her mouth and nose or face area, . . . and he said that she . . . kept squirming around, and he said eventually she squirmed free, and when she had squirmed free, . . . she managed to be facing away from him. He said somehow she got free and then was facing away from him. He said that he then grabbed her from behind, and [his] elbow was near her nose and mouth area . . . . He said he put . . . his arm around her neck so that his elbow was near her nose and mouth. He said she continued to fight and that for being so small, she was very strong and that she at one point was attempting to kick him and elbow him. . . . [H]e said that she kept elbowing [him].

Mathew told the officer Hall "just stopped fighting," but "he knew she was gone . . . when she . . . had peed herself." When asked by the officer if Hall "just pass[ed]," Mathew told him "[i]t wasn't anywhere that neat." Mathew told the officer that after he knew Hall had died, he "just freaked out. He said he then drove the van with her dead body in the back, and he drove west through town." He told the officer that when he got in the driver's seat of the van, he called his wife "and said, 'I'm driving [Hall's] van, and [Hall's] in the back,' and . . . he asked her to come pick [him] up . . . , and she said she would." "[H]e then just parked [the van] alongside the road." He left the keys on the front seat, where they were found. Mathew told the officer he then ran into the nearby "cornfields in an

attempt to make his way back to town and to make his way back to his house." Mathew initially told the officer he walked all the way home but later told the officer during the call that Shawn "had actually picked him up before he had gotten to his house." Mathew told the officer that he later took a shower and changed his clothes, and thereafter, Shawn drove them to the casino. On the way, they threw out articles of clothing and, after destroying it in the car, the pieces of his cell phone.

Mathew voluntarily came back to the sheriff's office for another interview, which was video-recorded and played for the jury. In that interview, Mathew related essentially the same story he gave the officer on the phone. Mathew was arrested thereafter. Mathew had injuries on his hands, forearm, and bicep, along with some scratches on his back. He told the officers the injuries on his hands were sustained when he had fled from the van and had fallen in a creek, and the scratches on his back were caused by Shawn. Mathew was subsequently charged with first-degree murder.

In August 2013, Mathew filed notices that he intended to offer evidence of self-defense and intoxication. At trial, Mathew testified that on the night of Hall's death:

> [He] kind of had a feeling [Shawn] was going to sneak over to the casino, . . . telling [him] not to wait up for her, and [he] kind of got to thinking [he] should sneak over to [Hall's] house and see if she would do some dope with [him] and maybe [he'd] have sex with her, and [he] was kind of wondering what . . . was up with [Shawn]. . . . [He] thought maybe [he] could get that out of [Hall].

Mathew testified he walked over to Hall's house, and they smoked marijuana. He began "kind of rubbing on her leg as [he] was sitting there next to her . . . to

see if she was receptive to come-ons," and she was. He testified Hall "[s]tarted out rubbing on [his] leg and then [they] stood up, and she was showing [him]— she had like a knife, and she was showing it to [him]." Mathew testified they continued rubbing each other and decided to go for a ride because Hall's teenage son was home and she did not want to get caught. They found a place "kind of tucked off behind everything," and Hall parked the van. He testified they proceeded to have oral sex in the back of the van, as he previously told officers in his other interviews, but he testified that when he told Hall he was not becoming aroused, "[s]he pretty much flipped out." He testified she smacked him and tried to punch him "in the mouth, and then she was screaming, 'You fucker; you fucker; I'm going to kill you.'" He testified he pushed her away, but she came back at him, hitting him in the mouth, trying to smack and claw him, all while continuing to yell, "You fucker; you fucker; and . . . I'm going to kill you." He testified he "tried to push her down again, harder this time, and she landed on her back. She went all the way down on her back." He

> turned to [his] left towards the door, and [he] pretty much no more than got turned around and she—before [he] got turned around, she kicked [him] once in the back, and then [he] got turned around a little more, and she kicked [him] in the ribs . . . , and [he] should have kept going, but [he] turned around, and when [he] turned around, she kicked at [him] again. [He was] pretty sure she was trying to kick [him] in the crotch.

He testified he told Hall to stop and "just quit it," but she continued to try "to hit [him], trying to poke [him] in the eyes, and that's when [he] shoved her back down the third time." He "kind of jumped up on her just to hold her down, and . . . [he] had one hand on her shoulder and one hand on her face, and [he] was holding it, and she was trying to roll over . . . to her right side." He "tried to

keep her on the floor, but [he] couldn't, and when she got rolled over to where she was kind of facing away from [him], [he] dropped down on the floor and put [his] arm around her neck and [his other] arm around her waist just to hold her."

He

> let go of her neck because [he] thought [he] was going to break her neck. . . . [A]round that time she spit at [him], and she started coming back up. Right away [he] held her down, and she tried to kind of get away, and . . . as [he] was pushing her down, [he] kind of slid her over in the corner of the van, and that's just—that's just how it happened.

He testified

> she kind of got a little bit quieter, and then, you know, she's cussing [him] the whole time, and she kind of got quiet . . . . [He] kind of felt her right hand. Like she patted [him] on the leg . . . . [He] kind of took that as [she gave] up, and then she quit moving. And then— and then she peed on the carpet, and [he] realized that she was dead.

He testified that although he was not "so much" physically afraid of Hall, he had "never known her not to have a knife, and she was mad as hell." Mathew testified he did not tell the officers that Hall threatened to kill him several times because "originally [he] thought [he] had told them, but [he didn't] know a lot of details in that interview." He had assumed Hall had a knife on her because he had "never ever seen her without one or three or four knives," and he did not get out of the van because he thought he "could restrain her and get her to chill out." He testified he acted in self-defense, but he did not intend to kill Hall. He testified that he thought the amount of force he used to respond and react to Hall's actions seemed reasonable at the time, but he testified he was unsure now, since she had died.

The jury found Mathew guilty of second-degree murder. *See* Iowa Code §§ 707.1, .3 (2013). He now appeals.

## II. Discussion.

On appeal, Mathew asserts his trial counsel was ineffective in failing (1) to argue the evidence was insufficient to establish he acted with malice aforethought; (2) to assert and request a jury instruction on imperfect self-defense; (3) to challenge hearsay statements and personal opinions presented by law enforcement officials; and (4) to object to the prosecutor's statement in closing argument that a defendant must pick only one legal defense and may not present inconsistent theories. Mathew contends that if not individually prejudicial, the cumulative effect of the errors denied him a fair trial. We address his arguments in turn.

### A. Ineffective Assistance of Counsel and Fair Trial.

We review ineffective-assistance-of-counsel claims de novo. *See Dempsey v. State*, 860 N.W.2d 860, 868 (Iowa 2015). We generally preserve such claims for postconviction-relief proceedings where a proper record can be developed. *See State v. Null*, 836 N.W.2d 41, 48 (Iowa 2013). "That is particularly true where the challenged actions of counsel implicate trial tactics or strategy which might be explained in a record fully developed to address those issues." *State v. Clay*, 824 N.W.2d 488, 494 (Iowa 2012). "[A]t a postconviction relief hearing, trial counsel will have an opportunity to explain [his or] her conduct and performance." *State v. Blair*, 798 N.W.2d 322, 329 (Iowa Ct. App. 2011). "Even a lawyer is entitled to his day in court, especially when his professional reputation is impugned." *State v. Bentley*, 757 N.W.2d 257, 264 (Iowa 2008).

Consequently, we will only address claims of ineffective assistance of counsel on direct appeal when the record is sufficient to decide the issue. *See State v. Ross*, 845 N.W.2d 692, 697 (Iowa 2014). We find the record adequate here.

To succeed on a claim of ineffective assistance of counsel, Mathew must prove both that (1) his counsel failed to perform an essential duty and (2) he suffered prejudice as a result of his counsel's failure. *See id.*; *see also Strickland v. Washington*, 466 U.S. 668, 687 (1984). Counsel does not provide ineffective assistance if the underlying claim is meritless; in other words, counsel has no duty to engage in an exercise in futility. *See State v. Halverson*, 857 N.W.2d 632, 635 (Iowa 2015). Only if the underlying claim has merit will we move to the determination of whether the failure to make the claim amounted to a breach of duty and whether the defendant was prejudiced by the breach. *See id.*

To determine whether counsel failed to perform an essential duty, "we measure counsel's performance against the standard of a reasonably competent practitioner," objectively assessing whether counsel's performance "was reasonable, under prevailing professional norms, considering all the circumstances." *State v. Thorndike*, 860 N.W.2d 316, 320 (Iowa 2015). Counsel's competence is presumed. *See id.* On the second prong, Mathew has to establish his "counsel's errors were so serious as to deprive [him] of a fair trial." *See id.* He must prove "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See id.* A mere showing that the error conceivably could have influenced the proceeding's outcome is not sufficient. *See id.*

### 1. *Malice Aforethought.*

Mathew asserts the evidence was not sufficient to show he acted with "malice aforethought" when he killed Hall, and his trial counsel was therefore ineffective for not challenging the sufficiency of the evidence on this element. In reviewing challenges to the sufficiency of the evidence, we view the record in the light most favorable to the non-moving party—here, the State—and make all legitimate inferences and presumptions that may be reasonably deduced from the evidence. *See State v. Quinn*, 691 N.W.2d 403, 407 (Iowa 2005). Evidence is substantial if it would convince a reasonable trier of fact the defendant is guilty beyond a reasonable doubt. *See id.*

Malice aforethought is an essential element of second-degree murder and separates second-degree murder from other lesser-included offenses of first-degree murder. *See State v. Reeves*, 670 N.W.2d 199, 207 (Iowa 2003). "Malice aforethought is a fixed purpose or design to do physical harm to another that exists before the act is committed." *State v. Myers*, 653 N.W.2d 574, 579 (Iowa 2002). It does not need to exist for any particular length of time; it is sufficient if the purpose was formed and continued to exist at the time the act was committed. *See Reeves*, 670 N.W.2d at 207. "Because this element is a state of mind, circumstantial evidence is generally used to prove malice." *State v. Buenaventura*, 660 N.W.2d 38, 49 (Iowa 2003). The relationship between the state of mind, malice aforethought, and the homicidal act "is more accurately characterized as a causal relationship than as a temporal relationship." *Bentley*, 757 N.W.2d at 265. "In other words, the malice must result in the homicidal act." *Id.* "Evidence of bad feelings or quarrels between the defendant and the victim

are circumstances that may be used to support a finding of malice aforethought." *Buenaventura*, 660 N.W.2d at 49.

Mathew asserts the "only evidence presented to the jury about the events that transpired the night of July 13, 2013, came from [him]," and he points to his own testimony that Hall's death was accidental and that he acted with justification in protecting himself. However, it was for the jury to determine whether Mathew's testimony was credible. *See State v. Blair*, 347 N.W.2d 416, 420 (Iowa 1984) (stating that "evidence, if deemed credible by the jury, would substantiate defendants' alibi and serve to acquit defendants," but noting "the jury is at liberty to believe or disbelieve the testimony of witnesses as it chooses"). "The jury is free to believe or disbelieve any testimony as it chooses and to give weight to the evidence as in its judgment such evidence should receive." *State v. Thornton*, 498 N.W.2d 670, 673 (Iowa 1993). To reach their verdict, it is the function of the jury to sort out the evidence presented and place credibility where it belongs. *See Blair*, 347 N.W.2d at 420; *see also State v. Musser*, 721 N.W.2d 758, 761 (Iowa 2006) ("It is not the province of the court . . . to resolve conflicts in the evidence, to pass upon the credibility of witnesses, to determine the plausibility of explanations, or to weigh the evidence; such matters are for the jury.").

Mathew maintains his testimony was "essentially the same version of events he gave police in his second interview," but he ignores crucial differences between his testimony and his two recorded interviews. Specifically, he never mentioned in his interviews that he thought Hall had a knife, that Hall threatened to kill him, or that he feared for his life. Assuming his failure to mention these details in his first interview can be explained by his total denial of his involvement

in Hall's death, his failure to bring up these details in the second interview, which he came in for voluntarily and admitted to killing Hall, has no rational explanation. Though he appeared sleepy and sometimes had slurred speech in the second interview, his account of what happened that night was detailed and straightforward, and he had no reason to omit these details from the interview if true. Furthermore, his trial testimony that he did not tell the officers because he thought he already had does not add up. Moreover, Mathew admitted he was upset with Hall and that he told others that he would like to kill her and throw her in the river.

Murder in the second degree is a general intent crime. *See State v. Lyman*, 776 N.W.2d 865, 877 (Iowa 2010). Clearly, viewing the record in the light most favorable to the State, the jury could have found Mathew's actions were not accidental or justified. We therefore find his claim to be without merit, and his counsel therefore had no duty to object and was not ineffective.

### 2. Imperfect Defense.

Mathew next argues his trial counsel was ineffective in failing "to assert and argue the doctrine of imperfect self-defense." Mathew acknowledges the doctrine "has not been formally adopted in Iowa," but he asserts the argument was worth making and had counsel done so, there was a reasonable probability the jury would have chosen to convict Mathew of involuntary manslaughter rather than second-degree murder. We find his argument to be without merit.

In an unpublished opinion, this court previously addressed an ineffective-assistance-of-counsel claim for failure to assert the doctrine of imperfect self-

defense. *See State v. Gomez-Rodriguez*, No. 06-0527, 2007 WL 1688987, *1 (Iowa Ct. App. 2007). There, this court explained:

> Under Iowa law, self-defense is the justified use of force "when the person *reasonably* believes that such force is necessary to defend oneself or another from any imminent use of unlawful force." Iowa Code § 704.3 (emphasis added). The doctrine of imperfect self-defense, on the other hand, recognizes a defendant's honest but unreasonable belief that deadly force is necessary. *See, e.g.*, *State v. Jones*, 8 P.3d 1282, 1287 (Kan. Ct. App. 2000) ("Imperfect self-defense is an intentional killing committed with an unreasonable but honest belief that circumstances justified deadly force."); *State v. Faulkner*, 483 A.2d 759, 769 (Md. 1984) ("[W]hen evidence is presented showing the defendant's subjective belief that the use of force was necessary to prevent imminent death or serious bodily harm, the defendant is entitled to a proper instruction on imperfect self defense."). "The theory underlying the doctrine is that when a defendant uses deadly force with an honest but unreasonable belief that it is necessary to defend himself, the element of malice, necessary for a murder conviction, is lacking." *State v. Catalano*, 750 A.2d 426, 429 (R.I. 2000). In states where the doctrine of imperfect self-defense has been adopted, proof of an imperfect self-defense does not exonerate the accused but mitigates the homicide to voluntary manslaughter. *See, e.g.*, *People v. Vasquez*, 39 Cal. Rptr. 3d 433, 435 (Cal. Ct. App. 2006) ("When imperfect self-defense applies, it reduces a homicide from murder to voluntary manslaughter because the killing lacks malice aforethought.").

*Id.* at *1-2. Nevertheless, we determined Gomez-Rodriguez's trial counsel "had no duty to present a defense based on the doctrine of imperfect self-defense," noting that it had not been adopted in Iowa and finding it conflicted with Iowa statutory law, stating

> Iowa Code section 704.3 provides that "[a] person is justified in the use of reasonable force when the person *reasonably* believes that such force is necessary to defend oneself or another from any imminent use of unlawful force." (emphasis added). In essence, Gomez-Rodriguez is asking us to judicially create a new non-statutory defense. *See State v. Khouri*, 503 N.W.2d 393, 395 (Iowa 1993) (declining to adopt the doctrine of emotional disturbance in the absence of legislative action).

*Id.* at \*3. We declined "Gomez-Rodriguez's invitation to find his trial counsel breached any duty by failing to argue a defense that has not been adopted in this state, has been rejected in several other states, and is contrary to Iowa statutory law." *Id.*

The language of section 704.3 has not been amended since we decided *Gomez-Rodriguez*, nor has the legislature amended other sections of the Iowa Code to include the option of asserting a defense based upon the doctrine of imperfect self-defense. This could be interpreted as a "tacit approval of [the] decision." *See Drahaus v. State*, 584 N.W.2d 270, 276 (Iowa 1998) (holding that where the legislature has failed to amend a statute in response to a particular interpretation of the statute announced by the court, it is presumed that the "legislature has acquiesced in that interpretation"); *see also Swiss Colony, Inc. v. Deutmeyer*, 789 N.W.2d 129, 135 (Iowa 2010) ("Had the legislature intended to establish the forty-hour week as standard for full-time employment it could have done so."). In any event, we do not find the law has changed since *Gomez-Rodriguez*, and we decline Mathew's invitation to revisit the issue. Mathew's counsel had no duty to request the defense and was therefore not ineffective.

### 3. *Testimonial Evidence.*

Mathew next argues his counsel was ineffective for failing to object to alleged "hearsay evidence" related by the officers to Mathew in his first recorded interview, as well as an officer's trial testimony alleged to contain hearsay evidence. He also asserts the officers in the first interview "made numerous statements indicating their personal opinion of Mathew and that they knew he was involved in the commission of the offense." We disagree.

### i. Hearsay.

Mathew contends his trial counsel should have objected to the statements conveyed to him by the officers in the interview, allegedly made by Shawn, as well as the man with whom she was allegedly having an affair. Neither Shawn nor the man testified at trial. Mathew argues the statements made by the officers in the interview related evidence to the jury that the officers had other evidence of Mathew's guilt that was not introduced at trial. Additionally, he asserts the statements would undermine Mathew's theory of defense and bolster the State's argument that he acted with malice aforethought. The State disputes whether the statements were hearsay, but in any event, it argues the statements were cumulative of Mathew's own testimony and therefore harmless. We agree.

When an out-of-court declarant's statement is presented at trial to explain responsive conduct, and it not offered to show the truth of the matter asserted, it is not considered hearsay. *See State v. Tompkins*, 859 N.W.2d 631, 642 (Iowa 2015). Nevertheless, even if the statement is deemed to be hearsay, the hearsay testimony will be considered cumulative and rebut the presumption of prejudice if the hearsay statement is found to be trustworthy, based on the trustworthiness of the corroborating testimony. *See State v. Elliott*, 806 N.W.2d 660, 669 (Iowa 2011). For example, the Iowa Supreme Court has found hearsay evidence to be extremely trustworthy and its admission therefore harmless error where other witnesses, including the defendant, "all gave testimony corroborating the same line of testimony without objection." *Id.* (discussing *State v. Johnson*, 272 N.W.2d 480, 482-83 (Iowa 1978)).

Here, even assuming the complained of testimony was hearsay, we agree with the State that its admission was harmless. The statements challenged by Mathew were confirmed by his own testimony. When asked on direct examination about his overall feelings towards Hall, Mathew testified he "was pretty pissed off" and that he probably stated to his wife that he wanted to kill Hall. On cross examination, Mathew admitted he told Shawn, "I ought to kill that—I'd like to kill that bitch and throw her in the river or something like that," but he denied saying it to Shawn's male friend. Given that Mathew admitted at trial he made the statements and similar ones, the alleged hearsay statements were merely cumulative and harmless. Mathew cannot show he was prejudiced for this reason. Consequently, he cannot show his counsel was ineffective for failing to object to the statements.

### ii. Opinion Testimony.

Mathew also argues the statements made by the officers during his first interview alleging that they knew he was involved and that he was lying to them were opinion evidence that should have been excluded, or, at the very least, his trial counsel should have requested a limiting instruction directing the jury to consider the statements for their limited purpose. Again, even assuming without deciding his counsel should have objected to the statements made by the officers, Mathew cannot show the required prejudice. As the State points out, this was not a "who-done-it" case. Mathew continually denied involvement in Hall's death in the first interview, despite the officers' statements and investigative tactics. And the officers were correct; Mathew was lying and involved in Hall's death, to which he confessed the next day. Mathew testified at

trial and admitted he lied, and he had the opportunity to explain his actions to the jury. He cannot show that had his counsel objected to the statements and had them redacted or if his counsel had requested a limiting instruction, the outcome of his proceeding would have been different. Consequently, he cannot show his counsel was ineffective for failing to object to the statements.

### 4. Prosecutorial Misconduct.

Mathew asserts his trial counsel was ineffective for failing to object to a statement made by the prosecutor during rebuttal, arguing the statement was an incorrect statement of the law. During closing arguments, the prosecutor stated in rebuttal:

> Let's look at the inconsistency of the defense theories in this case. What he did was an accident. He acted recklessly. He didn't mean to kill her. You heard his own words under oath. . . . That would be involuntary manslaughter [as set out in] Verdict Form Number 3. On the other hand, they claim that [Mathew] is not guilty because he was justified of his acts, because he acted in self-defense [corresponding to] Verdict Form Number 4. See, simply under the law, you pick a legal excuse supported by evidence, but these are inconsistent. They simply both cannot be true. They cannot both be true. And that's the trouble with the facts and the trouble with the truth. This crime scene, it only happened one way. This isn't a game where you pick A or B or in this case 3 or 4. And quite simply, neither one of these defenses as they claim is a valid legal excuse because [Mathew] intentionally committed this crime.

A party is entitled to a new trial based on prosecutorial misconduct only if the party has shown prejudice. *See State v. Bowers*, 656 N.W.2d 349, 355 (Iowa 2002). "Thus it is the prejudice resulting from misconduct, not the misconduct itself, that entitles a defendant to a new trial." *State v. Graves*, 668 N.W.2d 860, 869 (Iowa 2003) (citation omitted). A prosecutor is entitled to "some latitude" during closing arguments in analyzing the evidence admitted at trial. *See id.* at

874. A prosecutor may argue the reasonable inferences and conclusions to be drawn from the evidence, but may not suggest that the jury decide the case on any ground other than the weight of the evidence introduced at trial. *See id.* The prosecutor cannot assert a personal opinion, create evidence, or misstate the law. *See id.*

It is true that defendants "may present diverse theories of defense, even those as 'inconsistent' as insanity and alibi." *State v. Broughton*, 425 N.W.2d 48, 50 (Iowa 1988). But Mathew was able to present those inconsistent theories at trial, as well as given the opportunity to explain the inconsistency, if any. Mathew does not point to any case law that says the prosecutor cannot point out the inconsistencies to the jury, nor do we find any. It makes sense that a prosecutor would be able to point out the inconsistencies, particularly where the defendant's credibility is at issue. Ultimately, the attack is on the inconsistent actions, not the asserted theories. Here, Mathew testified he inadvertently smothered Hall in self-defense. However, he is only entitled to use reasonable force to prevent injury to himself. The State was entitled to point out that Mathew had other options, such as exiting the van, that made his actions to stay and hold Hall to the point of smothering her unreasonable and inconsistent with his claim his actions were necessary to defend himself. Because we find no error in the prosecutor's statements, Mathew's trial counsel had no duty to object and was therefore not ineffective.

### B. Cumulative Error.

Finally, Mathew maintains we should determine whether he was prejudiced by the cumulative effect of trial counsel's errors. *See Clay*, 824

N.W.2d at 500 ("Under Iowa law, we should look to the cumulative effect of counsel's errors to determine whether the defendant satisfied the prejudice prong of the Strickland test."). While we agree that consideration of cumulative prejudice is the proper analysis, we have already concluded that most of Mathew's allegations did not amount to a failure to perform an essential duty. Assuming without deciding his counsel had a duty to object to the complained of testimonial evidence, for the reasons stated above, Mathew cannot show there was a reasonable probability that, but for counsel's failure to object to the admission of the hearsay and opinion evidence, individually or cumulatively, the result of the proceeding would have been different. Those complained of statements were cumulative of other testimonial evidence given by Mathew at trial. Consequently, Mathew's trial counsel was not ineffective.

### III. Conclusion.

For all of the foregoing reasons, we affirm Mathew's conviction of second-degree murder.

**AFFIRMED.**