# IN THE COURT OF APPEALS OF IOWA

No. 15-1529
Filed May 3, 2017

**CHRISTOPHER JOHN SIMPSON,**
Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
Respondent-Appellee.
_____

Appeal from the Iowa District Court for Webster County, Thomas J. Bice, Judge.

Christopher Simpson appeals the denial of his postconviction relief application. **REVERSED AND REMANDED.**

R. Ben Stone of Parrish Kruidenier Dunn Boles Gribble Gentry Brown & Bergmann L.L.P., Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Sheryl Soich, Assistant Attorney General, for appellee State.

Heard by Danilson, C.J., and Vogel and Vaitheswaran, JJ.

**VAITHESWARAN, Judge.**

A jury found Christopher Simpson guilty of four counts of third-degree sexual abuse in connection with acts he committed on two boys, ages fourteen and fifteen. This court affirmed his judgment and sentences, which, with enhancements, resulted in four life terms. *State v. Simpson*, No. 10-1554, 2011 WL 3117888, at *3 (Iowa Ct. App. July 27, 2011).

Simpson filed a postconviction relief application. The district court denied the application following an evidentiary hearing. On appeal, Simpson contends his attorneys were ineffective in failing to: (1) object to expert testimony arguably vouching for the teens' credibility and the State's comments about the expert during closing argument; (2) challenge the prosecutor's questioning about a witness' invocation of his Fifth Amendment right against self-incrimination; (3) seek a jury instruction on assault with intent to commit sexual abuse as a lesser included offense; and (4) challenge the admission of an un-redacted text message that implied he had a criminal record. We find the first issue dispositive.

## I. *Vouching*

Simpson contends an expert witness called by the State impermissibly vouched for the credibility of the teens who testified against him. He specifically argues the State, through its expert, "engaged in point-by-point reinforcing of [one victim's] prior testimony, as well as foreshadowing [the other victim's] anticipated future testimony" and his "trial lawyer failed to object to the continuous and cumulative inadmissible testimony as it happened, and then

failed to object as the State, during closing, brought home to the jury the vouching power of its expert witness to compel a guilty verdict."

Simpson's postconviction attorney raised the issue at the postconviction hearing and in a post-hearing brief. The postconviction court characterized the "general gist of" Simpson's claims as "ineffective assistance of counsel," including a claim "that trial counsel failed to object to the State's closing arguments suggesting that 'grooming' had been done of the victims for sexual purposes." The court summarily rejected the issue after concluding Simpson "had a full and fair opportunity to cross-examine" the expert and the State's closing argument did not suggest Simpson committed "prior bad acts." We conclude Simpson preserved error on his claim that trial counsel was ineffective in failing to object to expert testimony vouching for the credibility of the complaining witnesses and in failing to object to that portion of the prosecutor's closing argument addressing the expert testimony. *See Lamasters v. State*, 821 N.W.2d 856, 864 (Iowa 2012) ("If the court's ruling indicates that the court *considered* the issue and necessarily ruled on it, even if the court's reasoning is 'incomplete or sparse,' the issue has been preserved." (citing *Meier v. Senecaut*, 641 N.W.2d 532, 540 (Iowa 2002))). But, even assuming the only issue preserved is Simpson's ineffective assistance claim relating to the prosecutor's closing comments about the expert testimony, that issue cannot be addressed without first examining the expert testimony. Accordingly, we begin our discussion of this issue with the pertinent facts and proceedings.

The State listed an expert witness to testify to perpetrators' sexual grooming behaviors and efforts to desensitize victims. Simpson filed a motion in

limine seeking to exclude the expert testimony in its entirety. The district court denied the motion.

At trial, the State called Lana Herteen to testify to "child sexual abuse dynamics." Simpson objected to the "line of questioning." The district court reaffirmed its prior ruling.

The prosecutor asked Herteen about delayed disclosure of sex abuse by teens. She cited statistics finding "about 86 percent of adolescents who have been sexually abused do not tell right away, if ever, though that has to be couched in the ones that they can confirm."

The prosecutor proceeded to question Herteen about "grooming," which she defined as "a gradual sexualizing of the relationship between an adult" and a child. She also questioned Herteen about "sexualization" of victims. In the course of this questioning, the prosecutor asked Herteen about "hypothetical" facts that focused on "teenagers specifically" and "male teenagers specifically." These facts mirrored the narratives of the two boys.

For example, the teens testified to an incident at Simpson's pool in which Simpson "pulled down [one of the teen's] swimming trunks and threw them out of the pool." The prosecutor asked Herteen to address a hypothetical set of facts that included "depantsing":

> Q. All right. Say, hypothetically speaking, depantsing somebody in a swimming pool, if that's done by an adult and that's the only thing that happens, it's a joke and whatever, that can be viewed one way; but if it's followed by more sexualization, could it be pretty much the beginning of the grooming? A. It could be.

The teens also testified that Simpson showed them websites with sexual content, as well as pornographic DVDs. The prosecutor pursued this testimony with Herteen, asking her to provide other examples of types of "sexualization" activity. Herteen responded:

> [I]t can begin with like watching R-rated movies . . . [with] lighter sexual themes. It might then progress to some talk or discussion about sex and sexuality. And then it may progress to exposure to pornography. . . . It can be photographs; it can be something that's on the computer; it can be videos.

In the same vein, the teens testified about a video they were shown involving sexual activity by Simpson's roommate. The prosecutor pursued these facts with Herteen as follows:

> Q. Hypothetically speaking, say a teenager is shown a video of other children, pornography, child pornography, basically, if that person that is seeing it knows one of the people in that video, can that make it seem even more normal to the person? Does that make sense? A. Yes. I would say whether they know them or not, there might be an increased value if they did know them because there can be that sense of "Well, this person did this or that and, therefore, that is something that can be done, um, something that can go on or occur."

The teens testified Simpson sat down with the boys as they watched pornographic videos and he touched himself. The prosecutor proceeded to a question about masturbation, asking, "[H]ypothetically, if an adult male was to walk in while . . . a teenager was masturbating," would a healthy response be to "sit down and join in?" Herteen replied, "Absolutely not."

The teens testified Simpson offered them memberships for an online game in exchange for oral sex. Herteen discussed children's "tendency to . . . focus on the positive aspects of the relationship," including "gifts" or "promises of gifts."

The teens stated Simpson had sex toys in his house. One of them testified Simpson told them about the toys and told them how to use them. Herteen discussed the presence of "sex toys that are visible or within finding of a teenager."

Finally, Herteen discussed a "core of truth" in victims' testimony and efforts to coach victims to tell false stories:

> Q. . . . . Are you aware, in your training and experience . . . of any kind of research on the ability of, say, teenagers to maintain a consistent story over a long period of time if it's false? A. Yes. What becomes important is to look at what the literature refers to as a core of truth. Over a period of time—and this is true not just of teenagers but people in general—our memories are affected by time, there can be some fade. So there can be some—I guess I would refer to it as minimal variation. But the core of truth is what becomes critical to attend to and to look at, um, what is the essence of the person's statement, I refer to it, or their information that they're offering.
> Q. And, in fact, is there not also literature that if someone is told, "you need to tell this lie . . ." for whatever reason, that over a period of time, that breaks down, that . . . adolescents in the developmental stages that you're talking about generally cannot keep that— A. Yeah. What you're referring to is what we refer to as coaching, coaching someone to lie or be dishonest. And yes, I would agree with that. That typically does not hold water over time. It eventually starts to unravel or come apart in a way that it lacks that core of truth.

Although Simpson's attorney objected to Herteen's testimony as a whole and reasserted this objection at trial, he failed to object to the testimony summarized above, as it was elicited.

Simpson's attorney also failed to object to the prosecutor's closing summary of the grooming activities described by Herteen and the following portion of the State's closing argument:

That is grooming, ladies and gentlemen. That is exactly what the expert came in here and told you about. And that's what the Defendant did in this case.

Now, to follow the train of thought for the defense in this case, we need to believe the absurd. We have to believe that . . . the boys just happen to luck into coming up with a series of facts that match, amazingly match, what known convicted sex child abusers thrive on to victimize their victims. And that's what Lana Herteen came in and talked about. She's not talking about this case. She's talking about known convicted sex offenders, what they do, how they get their victims primed for sexual abuse and then sexually abuse them. And boy, aren't these people really lucky that they happen to come up with the same facts that match that?

They don't just luck into that, ladies and gentlemen. What happened is that he groomed them, and their facts corroborate that. They don't just happen to luck into showing the core truth that Lana Herteen tells you is a way to weed out false stories. She gave you the pieces of information that you would need to be able to weed out false stories, and that's not here. They don't just happen to show a lack of coaching as Lana Herteen told you about.

They weren't coached, so that's why you can't find that in this case. They do tell you what happened in this case. It's not a false story.

Because counsel failed to object, we review the issue under an ineffective-assistance-of-counsel rubric, as Simpson requests. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Simpson must prove the breach of an essential duty and prejudice. *See id.*

To determine whether there was a breach, we turn to our precedent on expert testimony in sexual abuse cases. More than thirty years ago, the supreme court concluded "expert opinions as to the truthfulness of a witness is not admissible pursuant to [Iowa Rule of Evidence] 702." *State v. Myers*, 382 N.W.2d 91, 97 (Iowa 1986). The court found expert testimony that young children do not lie about sexual matters crossed the "'fine but essential' line between an 'opinion which would be truly helpful to the jury and that which

merely conveys a conclusion concerning defendant's legal guilt.'" *Id.* at 98 (citation omitted).

As noted, Herteen opined on several matters. We will separately address each category of her opinions: (A) her reference to statistics on delayed reporting; (B) her response to hypothetical questions on perpetrators' grooming behaviors; and (C) her discussion of a "core of truth" in victims' testimony and coaching of victims.

### A. Statistics

Statistics regarding the truthfulness of children alleging sexual abuse are inadmissible. *See State v. Tracy*, 482 N.W.2d 675, 678 (Iowa 1992) (concluding an expert's testimony that "there are probably no more than two or three children per thousand who come forth with such a serious [sexual abuse] allegation who are found later to be dishonest" was improper); *Myers*, 382 N.W.2d 91, 92 (Iowa 1986) (reversing admission of expert testimony that included a statement that "out of about . . . 75 cases, there was only one . . . where the child was not telling the truth" and "one in 2500 children . . . did not tell the truth, which would make it exceedingly rare"); *State v. Pitsenbarger*, No. 14-0060, 2015 WL 1815989, at *3, *5 (Iowa Ct. App. Apr. 22, 2015) (reversing admission of expert testimony where expert testified "research shows that there is 4.7 or about 5 percent of children who make . . . false allegations").[1] However, statistics on the prevalence of

---

[1] In *Pitsenbarger*, we noted that the expert
> relied on the following statistics in her testimony: 72 to 100 percent of kids do not disclose abuse; only 11 percent of children actively disclose at first opportunity; 53 percent of mothers are not protective of children after they disclose; 65 percent of mothers are not supportive of a disclosing child; and only 5 percent of children who allege sexual abuse make false allegations and 'most' of those are caused by collusion with an adult.

delayed reporting of sex abuse have been deemed admissible. *See State v. Payton*, 481 N.W.2d 325, 327 (Iowa 1992) ("The general subject of . . . ['delayed reporting syndrome'] is proper for expert testimony."); *State v. Tjernagel*, No. 15-1519, 2017 WL 108291, at *9 (Iowa Ct. App. Jan. 11, 2017) (concluding counsel was not ineffective in failing to object to expert's testimony because "[h]er use of statistics at trial and comments that 'most disclosures' or 'most children do not tell right away' were not comments on whether children lie about sexual abuse, but rather, comments about when children typically disclose sexual abuse"); *State v. Royce*, No. 12-0574, 2013 WL 5508428, at *9 (Iowa Ct App. Oct. 2, 2013) ("The evidence was helpful and relevant to the jury in making their decision upon the right reasons—the evidence presented—and not based upon a common misconception or myth that delayed reporting necessarily means the claim is false.").

Herteen testified that "about 86 percent of adolescents who have been sexually abused do not tell right away, if ever." Her statistical reference focused on delayed reporting rather than false allegations and, standing alone, was not improper. That said, we cannot view her reference in a vacuum. We turn to whether her answers to hypothetical questions on grooming crossed the "fine line."

### B. Hypothetical Questions on Grooming

In deciding whether expert responses fall on the right or wrong side of the line, our courts have focused on how closely the responses were tied to the facts of the particular case. For example, an expert "was allowed to testify to the

2015 WL 1815989, at *8 n.4.

classic characteristics that are exhibited after people have experienced a trauma." *State v. Gettier*, 438 N.W.2d 1, 4 (Iowa 1989). The court found no abuse of discretion in the admission of this testimony because "[w]hile [the expert's] testimony centered around a particular aspect of [a] syndrome, commonly described as 'rape trauma syndrome,' . . . this term was not specifically referred to in the trial," the "testimony was framed in a general context," and "[t]here was independent evidence presented that the victim exhibited some of the listed symptoms." *Id.* (citations omitted).

This general/specific distinction was reiterated in *State v. Payton*, 481 N.W.2d 325 (Iowa 1992). The court found no abuse of discretion in the district court's admission of expert testimony that "did not relate to the specific children in this case." *Payton*, 481 N.W.2d at 327. In the court's view, the expert "was called only to explain why child sex abuse victims often delay reporting" sex abuse and the "testimony concerning typical psychological symptoms clearly fell on the proper side of the line drawn in *Myers*." *Id.*; *see also State v. Allen*, 565 N.W.2d 333, 338 (Iowa 1997) (concluding experts "did not directly evaluate [the complaining witness's] credibility" but "gave their opinions concerning the effects of her mental condition on her ability to tell the truth" and the "testimony was permissible to help the jury understand the evidence it heard about [the complaining witness's] mental illnesses"); *State v. Westmoreland*, No. 15-1951, 2017 WL 512479, at *4 (Iowa Ct. App. Feb. 8, 2017) (concluding an expert "testified to her general practices when interviewing child victims and the process by which children delay in reporting information about their abuse" and "did not attempt to improperly link [the child's] behavior to behaviors observed in known

sex abuse victims"); *State v. Ingram*, No. 15-1984, 2017 WL 514403, at *5 (Iowa Ct. App. Feb. 8, 2017) (concluding counsel was not ineffective in failing to object to expert testimony where the expert "discussed generally the symptoms or behaviors common to children who have experienced sexual abuse," "explained behaviors exhibited by both young children and young teens," and "did not provide an expert opinion regarding 'every significant purported and disputed fact'" (citations omitted)); *State v. Lusk*, No. 15-1294, 2016 WL 4384672, at *3 (Iowa Ct. App. Aug. 17, 2016) (affirming admission of expert testimony where forensic interviewer "did not testify the demeanors of [the victims] were consistent with sexual abuse" but "testified generally about whether child victims of sexual abuse sometimes delay reporting the abuse"); *State v. Huffman*, No. 14-1143, 2015 WL 5278980, at *6 (Iowa Ct. App. Sept. 10, 2015) (concluding expert testimony that children used developmentally appropriate language did not cross the line); *Royce*, 2013 WL 5508428, at *9 (concluding testimony did not cross the line where the expert "testified generally as to the mental state of the child sex abuse victims and why they may delay reporting sex abuse," "offered no testimony as to the truthfulness of [the victim's] testimony or whether sexual abuse did or did not occur," and "did not testify if allegations of child sex abuse are generally true"); *State v. Seevanhsa*, 495 N.W.2d 354, 357 (Iowa Ct. App. 1992) (stating "expert testimony regarding [child sexual abuse accommodation syndrome (CSAAS)] may, in some instances, assist the trier of fact to both understand the evidence and to determine facts in issue" and concluding the expert testimony in that case was admissible because "the expert limited her discussion of CSAAS to generalities," "did not testify she believed the

complainant was credible," and did not "testify that she believed the complainant had been sexually abused"); *State v. Fox*, 480 N.W.2d 897, 899 (Iowa Ct. App. 1991) (finding expert testimony on general criteria used for verifying the truthfulness of sexual abuse allegations was permissible where the expert "was testifying about children in general" and "made no assessment of the complainants' credibility"); *State v. Tonn*, 441 N.W.2d 403, 405 (Iowa Ct. App. 1989) (concluding opinion testimony "could help the jury in understanding the evidence because it explained the delayed reporting symptom that existed in children who were sexually abused").

In stark contrast to the expert testimony in *Gettier* and *Payton*, an expert in another case "testified, without objection, that" a child suffered "from child sexual abuse accommodation syndrome" and "was telling the truth when she first reported sexual abuse by her stepfather." *Tracy*, 482 N.W2d at 678. The court concluded the defendant's attorney breached "an essential duty in failing to make a timely objection to the testimony." *Id.* at 680. The court further found the prejudice element satisfied based on "the cumulation of this evidence with [] other inadmissible testimony." *Id.*

This court similarly reversed the admission of expert testimony about sexual abuse trauma where the expert was presented with a hypothetical question which "outlined all the events the alleged victim had testified preceded the alleged rape," thereby "personaliz[ing] the opinion and conclusion." *State v. Pansegrau*, 524 N.W.2d 207, 211 (Iowa Ct. App. 1994). We concluded "[t]he testimony exceeded the permissible limits." *Id.*; *see also Pitsenbarger*, 2015 WL 1815989, at *8 (reversing for a new trial where, although the State did "not

specifically referenc[e] the testimony, past statements, past actions, and past behaviors of [the victim]," the expert "in a methodical process . . . bolstered [the victim's] credibility by testimony via statistics . . . . including behaviors . . . as being consistent with the statistics . . . and thus, corroborating [the victim's] testimony and lending credence to it").

The hypothetical questions posed to Herteen were not as egregious as the hypothetical question posed to the expert in *Pansegrau*. And, arguably, some of the questions simply focused on the general characteristics of abused children. However, Herteen's testimony about "depantsing," exposure to pornography, masturbation, and gift giving—all based on the teenagers' unique experiences with Simpson—have to be viewed in the context of what followed—an exchange about the "core of truth" in children's statements and their inability to persist in telling an untruth. To determine whether this "core of truth" testimony crossed the line, we return to *Myers*.

### C.    *"Core of Truth" and Coaching Testimony*

*Myers* categorically prohibited expert testimony on the truthfulness of witnesses. That holding was reinforced in a trio of recent opinions addressing expert testimony in child sex abuse cases. *See generally State v. Brown*, 856 N.W.2d 685 (Iowa 2014); *State v. Dudley*, 856 N.W.2d 668 (Iowa 2014); *State v. Jaquez*, 856 N.W.2d 663 (Iowa 2014).

In *Brown*, the court concluded a forensic examiner's statement that a child's disclosure was "significant" and warranted "an investigation" "indirectly convey[ed] to the jury that [the child was] telling the truth about the alleged abuse because the authorities should conduct a further investigation into the matter."

856 N.W.2d at 688-89. In *Jaquez*, the court similarly concluded expert testimony that a child's "demeanor was 'completely consistent with a child who has been traumatized, particularly multiple times'" was improper because it "indirectly vouched for [the child's] credibility thereby commenting on the defendant's guilt or innocence." 856 N.W.2d at 665. And, in *Dudley*, the court held expert testimony that a child's physical manifestations or symptoms were consistent with sexual abuse trauma and testimony that the child should receive therapy and stay away from the defendant "crossed the line." 856 N.W.2d at 677-78.

As discussed, Herteen was asked whether an adolescent told to tell a lie could maintain the lie over a period of time. She responded:

> What you're referring to is what we refer to as coaching, coaching someone to lie or be dishonest. And yes, I would agree with that. That typically does not hold water over time. It eventually starts to unravel or come apart in a way that it lacks that core of truth.

Herteen's testimony was not as direct a comment on witness credibility as the testimony found impermissible in *Myers* but was a more direct comment on the teens' credibility than the vouching testimony found impermissible in *Brown*, *Jaquez*, and *Dudley*. While she did not state the teens' conduct or demeanor was "consistent with" a syndrome or trauma, and she did not refer to Simpson or the teens by name, she essentially opined that teens would be unable to sustain a false story over time or, in other words, lie.

We recognize expert opinions on the consistency of child statements are permissible. *See Brown*, 856 N.W.2d at 688-89 (concluding expert's statement that victim "has been consistent in what she has reported to her mother and to this examiner" were permissible and gave "the jury insight into the witness's

memory and knowledge of the facts"); *Dudley*, 856 N.W.2d at 678 ("The first statement by [the expert] was that [the victim's] statements were consistent throughout the interview. We do not find this statement crossed the line."). But Herteen did more than opine that the teens said the same thing to one witness as they did to another; she basically said they would be incapable of doing anything else.

We also recognize a general statement about coaching may be permissible. *See Dudley*, 856 N.W.2d at 678 (concluding a statement about "participation in therapy, in and of itself, does not mean the therapist is coaching the victim"). But Herteen did not speak in generalities; she opined that coaching of adolescents to give false statements "does not hold water over time."

Herteen's opinions, when viewed in their totality, crossed the line. *See Tjernagel*, 2017 WL 108291, at *5 ("[N]ot all testimony relating to the subject of coaching is admissible."). As in *Pitsenbarger*, the State methodically elicited testimony from her that bolstered the teens' credibility. *Cf. id.*, 2015 WL 1815989, at *8. We conclude Simpson's trial attorney had a duty to object to her testimony as it was elicited and breached that essential duty. *Id.* ("We conclude the State crossed the line in its direct examination of [the expert] and defense counsel failed to object to the form of questioning."). We further conclude Simpson's attorney had a duty to object to the prosecutor's discussion of this testimony in closing argument.

We turn to the *Strickland* prejudice prong of the ineffective assistance test. To satisfy the prejudice prong, an applicant must show "a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would

have been different." *Strickland*, 466 U.S. at 694. We have found this standard satisfied when the evidence of guilt was overwhelming. *See State v. Ambrose*, 861 N.W.2d 550, 559 (Iowa 2015) (concluding "there was no reasonable probability the result of the trial would have been different" where "[t]he evidence of guilt was overwhelming"). However, in opinions raising the propriety of expert testimony in sex abuse cases, our court has analyzed *Strickland* prejudice in the context of witness credibility. *See, e.g.*, *Tjernagel*, 2017 WL 108291, at *8 (finding prejudice where "the State's case . . . rested entirely on the credibility of the witnesses[,] . . . [t]here was no physical evidence of the alleged abuse and no witnesses other than the complaining witness," and "the expert witnesses' vouching testimony here 'was pervasive—not just a single statement'"); *Pitsenbarger*, 2015 WL 1815989, at *10 (concluding "the result may have been different if proper objections had been made to exclude the improper testimony" because "the State's case . . . rested entirely on the credibility of the witnesses").

As discussed, Herteen's "core of truth" colloquy with the prosecutor was an endorsement of the teens' credibility. While the State argues "[a]ny expert called by the State in a criminal case will offer testimony that supports or corroborates the victim's version of events in some fashion," Herteen's assertion that adolescents were essentially incapable of perpetuating falsehoods amounted to a comment on these teens' credibility and generated a reasonable probability that the outcome would have been different had counsel objected and had the court sustained the objection.

In reaching this conclusion, we have considered our comments in Simpson's direct appeal about the strength of the State's evidence. *See*

*Simpson*, 2011 WL 3117888, at *2. There, we addressed a challenge to the admission of a text message. We concluded a sufficient foundation was laid for admission of the text message but, regardless, "[o]ther evidence supporting Simpson's convictions was overwhelming." *Id.* Then and now, we have no quarrel with the strength of the State's evidence relative to the text message. But in this appeal, we are dealing with something far more insidious: an expert's usurpation of the fact finder's role in determining witness credibility. *See Myers*, 382 N.W.2d at 95 ("Weighing the truthfulness of a witness is a matter reserved exclusively to the fact finder."). And, we are dealing with a constitutional prejudice standard rather than the non-constitutional harmless error standard at issue on direct appeal. For these reasons, our statements on direct appeal do not control our prejudice determination here. *Strickland* prejudice was established.

## II.    Conclusion

We conclude counsel was ineffective in failing to object to Herteen's testimony that vouched for the credibility of the teenagers and in failing to object to the prosecutor's discussion of the testimony in closing argument. We reverse the denial of Simpson's postconviction relief application and remand for a new trial. In light of our disposition, we find it unnecessary to address the remaining issues raised by Simpson.

**REVERSED AND REMANDED.**

Danilson, C.J., concurs; Vogel, J., concurs specially.

**VOGEL, Judge.** (concurring specially)

While I agree with the majority that the expert testimony from Lana Herteen regarding grooming behavior crossed the line into impermissible vouching in this case, I write separately to note Simpson's claim on appeal—that trial counsel was ineffective in failing to object to the admission of Herteen's expert testimony—was not preserved for our review at the postconviction relief proceeding below.

At the PCR hearing on July 16, 2015, Simpson's counsel submitted three issues to be considered, which were outlined in Simpson's PCR application: (1) direct appeal counsel was ineffective for failing to raise the issue of the denial of the mistrial motion; (2) trial counsel was ineffective for failing to object to the State's cross-examination of a witness's invocation of his Fifth Amendment right against self-incrimination; and (3) trial counsel was ineffective in not objecting to the State's reference in the rebuttal closing argument to Herteen's discussion of grooming behaviors. Following the hearing, the court gave both parties two weeks to file additional briefing or authorities. On August 10, beyond the two week deadline set by the court, PCR counsel filed a document entitled "Merits Brief," in which he again raised the three issues above and for the first time raised a challenge to trial counsel's failure to object to the admission of Herteen's testimony under a "miscellaneous issues" heading. In that section PCR counsel states:

> After his comprehensive review of the Trial Transcript, the undersigned counsel identified the first three issues; however, after his extensive review of the case law, he also now believes that he should have raised the following issues:

A. Count IV: Trial counsel rendered ineffective counsel in failing to object to Expert Herteen's testimony on pages 245 and 246, to wit: Expert's Herteen testimony about teenagers not lying, or tell the truth about sexual abuse was inadmissible under *Myers*.

At the end of the discussion of this issue, counsel goes further to say:

Counsel believes he should have raised this issue in the original application. He understands that the State will likely object; however, if the underlying issue has merit, one way, or another it will be addressed since counsel offers no reason for not raising it other than mere oversight. *See Dunbar v. State*, 515 N. W.2d 12 (Iowa 1994) (ineffective assistance of counsel excuses procedural default of an issue). So to promote judicial economy, the Court might as well address it now. Counsel of course does not object if the State needs additional time to address this issue, or to reopen record if necessary.

The next issue raised by PCR counsel in his post-PCR "Merits brief" asserted direct appeal counsel was also ineffective in not raising a challenge to Herteen's grooming behavior testimony. PCR counsel goes on to say:

Again, Counsel candidly admits that he missed this issue. He understands either way whether the State, or this Court will rule that it is untimely, but believes it makes more sense to go ahead and address it now since it will be addressed on post-conviction appeal: (1) if the appellate court agrees that the issue has merit; and (2) if the court finds that the undersigned counsel should have raised it. He believes that he should have, and that it makes more sense to address it now rather than on remand 15 months from now.

The district court issued its decision the very next day following the filing of PCR counsel's "Merits Brief" that raised these two additional claims. In the PCR ruling, the district court did not take note of the "Merits Brief" filing or either of the additional two issues that were raised in the brief. Instead, it confined its ruling to the three issues raised in the PCR application and during the hearing. PCR counsel did not file a posttrial motion under Iowa Rule of Civil Procedure 1.904(2) asking the court to address the two additional claims raised in the "Merits Brief";

instead, thirty days after the court issued its decision, PCR counsel filed a notice of appeal.

For an issue to be raised and preserved for review on appeal, the issue must have been presented to and ruled on by the district court. *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002). "When a district court fails to rule on an issue properly raised by a party, the party who raised the issue must file a motion requesting a ruling in order to preserve error for appeal." *Id.* While we are not concerned with the "substance, logic, or detail in the district court's decision," the ruling still needs to indicate that the court "considered the issue and necessarily ruled on it, even if the court's reasoning is 'incomplete or sparse.'" *Lamasters v. State*, 821 N.W.2d 856, 864 (Iowa 2012). Here, I see no indication the court considered the issue of the admissibility of Herteen's grooming testimony; it only considered whether trial counsel should have objected to the State's closing rebuttal argument that recounted that testimony.

While the majority in this case combines the challenge to the rebuttal argument with the challenge to the admissibility of Herteen's testimony, I see the two issues as distinctly different. So did PCR counsel as he acknowledged in the "Merits Brief" that he had not previously raised a challenge to the admissibility of Herteen's grooming testimony and pleaded with the PCR court to address the issue despite its untimeliness. I would thus conclude that Simpson failed to preserve error on his claim that trial counsel was ineffective when counsel failed to object to Herteen's testimony on grooming, but that does not end my analysis.

Simpson's PCR appellate counsel alternatively raises the challenge through an ineffective-assistance-of-PCR-counsel claim. *See Dunbar*, 515

N.W.2d at 14-15 (recognizing a PCR applicant has the right to effective assistance of PCR counsel once counsel is appointed and can raise a claim on appeal that PCR counsel was ineffective in inadequately raising issues in the PCR proceeding); *see also State v. Fountain*, 786 N.W.2d 260, 263 (Iowa 2010) ("Ineffective-assistance-of-counsel claims are an exception to the traditional error-preservation rules."). Simpson claims his PCR counsel was ineffective at the district court for failing to timely assert his trial counsel was ineffective for not objecting to Herteen's grooming testimony.

When an ineffective-assistance claim is raised for the first time on appeal, we must determine if the record is adequate to address the claim. *Fountain*, 786 N.W.2d at 263. If the record is not adequate, it must be preserved for PCR proceedings. *Id.* I consider the record here adequate to address the claim of PCR counsel's ineffectiveness in light of PCR counsel's concession in the "Merits Brief" that the failure to raise the challenge to Herteen's grooming testimony was not based on any strategic decision but was "mere oversight." *See State v. Bentley*, 757 N.W.2d 257, 264 (Iowa 2008) (noting ineffective-assistance claims are often preserved because "[e]ven a lawyer is entitled to his day in court, especially when his professional reputation is impugned"). Because there is no need for additional record to establish why PCR counsel failed to challenge to the admissibility of Herteen's testimony, I conclude the claim of PCR counsel ineffectiveness should be addressed.

To establish PCR counsel was ineffective, Simpson must demonstrate counsel failed to perform an essential duty and he suffered prejudice as a result. *See id.* at 263. PCR counsel admits to failing to perform an essential duty by

failing to raise the challenge to Herteen's testimony. For all the reasons stated in the majority opinion, I conclude Herteen's testimony regarding grooming, when viewed in its totality, crossed the line into impermissible vouching and trial counsel breached an essential duty by failing to object to its admission. I agree Simpson suffered prejudice as a result of trial counsel's failure to object to the testimony, and therefore, I also conclude he suffered prejudice by PCR counsel's failure to timely raise this issue at PCR. I agree with the majority's decision to reverse the denial of Simpson's PCR application and remand for the entry of an order granting Simpson a new trial on the criminal charges.