# IN THE COURT OF APPEALS OF IOWA

No. 23-0449
Filed October 30, 2024

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**STEVEN EUGENE KROLL,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Monona County, Tod Deck, Judge.


A defendant appeals his convictions for sex offenses against minors.

**CONVICTIONS AFFIRMED, SENTENCE VACATED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS.**


Martha J. Lucey, State Appellate Defender, and Mary K. Conroy, Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Genevieve Reinkoester, Nicole L. Leonard, and Ian McConeghey, Assistant Attorneys General, for appellee.


Heard by Greer, P.J., Langholz, J., and Gamble, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2024).

**GAMBLE, Senior Judge.**

Steven Kroll appeals his convictions for an array of sex offenses against minors. He contests the exclusion of evidence under Iowa Rule of Evidence 5.412, asserts the district court erred in denying his request for a voluntary-participation instruction, challenges the sufficiency of the evidence for one offense, and claims the district court exceeded its authority in sentencing. We find the district court did not abuse its discretion by excluding the evidence under rule 5.412 or in denying his requested instruction, and sufficient evidence supports Kroll's conviction of sexual exploitation of a minor. We sever and vacate part of Kroll's sentence and remand for entry of a corrected sentencing order.

## I. Background Facts & Proceedings.

On June 11, 2019, the State charged Kroll with eleven criminal offenses related to his actions with two minors. The charges arose after his daughter S.K. (born 2003) alleged Kroll had sexual contact with her when she was thirteen years old and again when she was fifteen years old. Another minor female, S.L., alleged when she had been friends with S.K., Kroll had propositioned her multiple times and had touched her breast against S.L.'s will. Before trial, the State amended the trial information, dismissing several of the charges.

### S.K.

Between 2016 and 2019, S.K. lived in Monona County, Iowa with her father, Kroll, and her younger brother N.K. (born 2013). Although S.K. had her own bedroom, Kroll had her sleep in the room he shared with N.K. Kroll had S.K. perform many parenting functions for N.K., including feeding him and putting him to bed each night. S.K. testified that when she was thirteen, Kroll's fiancée died,

and he would have S.K. sleep in his bed and touch her after N.K. went to sleep. She described an incident when Kroll took off her clothes, had sexual intercourse with her, ejaculated on her, and told her to clean it up. S.K. testified she told Kroll to quit multiple times, but he didn't. Kroll told S.K. not to tell anybody or she and N.K. would be taken away and put into foster care. S.K. testified Kroll showed concerning behaviors before the incident and in the following years—he grabbed her thighs occasionally, criticized her body to his friends, let his friends make inappropriate comments to her, and told her to wear a bikini or "shorty shorts."

S.K. then described a second incident when she was fifteen years old. Kroll had S.K. sleep in his bed with him, and N.K. had a smaller bed in the room. Kroll rolled over, started touching her under her sports bra, then held her down, pulled down her pants, and had intercourse while S.K. told him to quit. When N.K. started to stir, Kroll finished on S.K.'s stomach and walked out. Kroll again told S.K. not to tell or she would "get taken away" and never get to see him or N.K. again. S.K. testified she was more concerned about not seeing N.K. again than never seeing Kroll again.

A few months later—in late February 2019—S.K. told a friend, Blake Bellis, what had happened. They started a group chat including S.K., Bellis and S.K.'s classmates S.L. and Ethan Gray, "saying that we needed to tell the truth." S.K. testified part of her motive for telling her friends was "so it wouldn't happen again." At Bellis's urging, S.K. called the sheriff's office the next morning to report Kroll; an officer met her at school to get her statement. A worker from the Department of

Human Services (DHS)[1] removed S.K. from Kroll's custody that night and took her to stay at her great-grandmother's house. Before she left, Kroll asked "Did you tell them what I did? Why did you do it?"

DHS told Kroll not to have any contact with S.K. during the investigation. But soon after the DHS worker left her at her great-grandmother's, Kroll showed up at the residence wanting to see S.K. Kroll again told her not to tell what happened, then he had S.K. take her password off her phone and give it to him; Kroll took the phone and left. Shortly after, Kroll's mother called and said she was going to take S.K. home with her. While S.K. was riding with her grandmother to Sioux City, Kroll called and talked with them through the vehicle's Bluetooth speakers. The next night, Kroll's mother had S.K. "write him a letter to make him feel better saying that none of it was true, that [she] made it up, and just to tell him that [she] love[d] him." S.K. testified her grandmother said if she did not write the letter, she couldn't watch TV or do her schoolwork. Kroll's mother had S.K. hold the letter up, telling her "to smile and act happy," then she took a picture and sent it to Kroll.

The next day, S.K. had an interview at the child advocacy center (CAC). S.K. only talked to the interviewer about the incident from when she was thirteen "because I thought we focused on the one." She did not mention the second incident in that interview, although the interviewer asked if there had been "any other times recently." She disclosed the second incident in a later interview.

---

[1] In 2022, DHS and the Iowa Department of Public Health merged into the Iowa Department of Health and Human Services. Because all relevant agency actions took place before the merger, we will refer to the agency as it was then—DHS.

Instead, during the first interview, she spoke of Kroll's friends mocking her body and that Kroll was "getting too close." After the interview, the DHS worker asked S.K. if she wanted to write another letter to Kroll, and she did: apologizing, saying everything will be okay and she would miss him. Although DHS recommended a medical exam of S.K., her grandmother refused it, saying "there was no need for one." S.K.'s grandmother was generally uncooperative with DHS and CAC during the interview process. A few days later, S.K. went to stay with her mother.

During S.K.'s testimony, the State asked, "Is it fair to say at times you made statements other than [what you testified to]?" and S.K. answered, "Yeah."

**S.L.**

S.L. and S.K. met their freshman year of high school in fall 2017; S.L. soon became S.K.'s best friend. They were usually at S.K.'s house. After a while, Kroll started making inappropriate comments that made S.L. feel uncomfortable. Kroll would tell S.L. "she needed to have sex because she was still a virgin as a freshman in high school" and said he or his friends "would help her do it." Kroll nicknamed S.L. "chicken dick" because she wouldn't have sex and constantly bullied S.L. with that nickname. S.K. used the nickname at first but stopped when S.L. said it made her "uncomfortable." Kroll asked S.L. to have sex with him several times and made a comment about when she would reach the age of consent. He told her she could drive his vehicle "if [she] would break it in with him," with similar comments about snowmobiles after winter came. Once she turned sixteen, Kroll "got pretty consistent with asking [her] to have sex with him." S.L. always told him no and was very uncomfortable. Another time, he asked her through Snapchat if she sent nude photos and if she wanted to see his cock, after

which he sent a picture of a rooster. Kroll talked about his penis with S.L., calling it "the punisher"—again making S.L. feel very uncomfortable.

Kroll sometimes joined in without asking when S.L. and S.K. were teasing each other. S.K. testified when S.L. came over, Kroll "would always try to tickle her" and recounted an occasion when Kroll grabbed her butt and S.L. yelled for him to stop, but Kroll just thought it was funny. S.L. testified about a time she and S.K. were teasing, and Kroll "smacked [S.L.] on the butt and then pulled [her] down on the couch," where Kroll had N.K. smack S.L. Another time, S.L, S.K., and N.K. were having a tickle fight when Kroll jumped in, held S.L. down as the other two backed away, and kept tickling her chest area, grabbing or slapping her breasts as she pushed him away, until she faked an asthma attack and then started vomiting. S.L. asked S.K. for help, and she said she didn't want to get involved and couldn't do anything about it.

S.K. and S.L. would communicate through social media, but Kroll had access to S.K.'s Facebook account on his phone and would use it. Kroll used S.K.'s accounts to send inappropriate comments to S.L. S.L. knew it wasn't S.K. sending the messages because she was often sitting with her or chatting with her on another platform, and S.K. did not send emojis and gifs in her messages.

In the fall of 2018, S.L. stopped visiting S.K. because she was "tired of all the nasty comments [Kroll] would say to her." After one comment where Kroll asked if S.L. wanted company in bed, the girls had a big fight and stopped talking for a time.

**Defense**

Kroll's defense was that S.K. was fabricating the abuse because she "was out of control and engaging in risky behavior" that he was trying to stop. He pointed to S.K.'s communications with eighteen- and nineteen-year-old men—including Bellis and Dylan Fassler. Kroll and S.K. fought about her cell phone use, and he took away her phone at times. Yet, when S.K. was asked about her own behavior—including what she talked about with the older boys and fighting with Kroll—she frequently answered, "I don't remember" and "I don't know."

S.K. started messaging with Bellis on Snapchat in fall 2018—she was fifteen, and he was nineteen years old. Both S.K. and Bellis testified they did not meet up in person during the relevant time period. In the weeks leading up to S.K.'s report to police, she had many long phone calls with Bellis, but she testified to not having much recollection of what they talked about. Kroll did not like S.K. chatting with Bellis, called him "a bad influence on people," and at one point called the police about him. S.K. denied knowledge about a Snapchat prank on Kroll, but a username and password to an account was allegedly found in her journal with a note "Snapchat prank on dad w/ blake"; the user was one in S.K.'s Snapchat contact list.

In May 2018, when S.K. was fourteen, she started messaging and Snapchatting with Fassler, an eighteen-year-old male who lived in another town. In early February 2019 S.K. was googling about "dirt bike family goals" and searches relating to Fassler's dirt bike/motocross hobby. Throughout 2018, S.K. wrote in her journal being Fassler's girlfriend, which at trial she testified was "fantasy" and they were "just best friends or friends." S.K. testified they met the

first time in March 2019 after S.K. had moved in with her mother, but they did not start "hanging out in person on a regular basis" until late 2020.[2] During a deposition, S.K. had denied wanting to be Fassler's girlfriend in 2018 and 2019. And she denied writing sections of the journal entries about him, saying the rest wasn't in her writing. When asked if she wrote "Dylan is my everything and Dad isn't going to stop me," S.K. answered "I don't remember." The parties entered a stipulation the journals belonged to S.K. and "the handwriting was consistent with having been written by a single author."

The jury found Kroll guilty of two counts of sexual abuse in the third degree (as to S.K.), two counts of incest (as to S.K.), one count of sexual exploitation of a minor (S.L.), and one count of assault causing bodily injury which "was sexually motivated and committed upon a minor under the age of [eighteen]" (as to S.L.).

## II. Standard of Review.

"We review district court rulings on the admissibility of evidence, including admissibility under Iowa Rule of Evidence 5.412 in criminal prosecutions, for abuse of discretion." *State v. Trane*, 934 N.W.2d 447, 455 (Iowa 2019). We reverse only if the court exercised its discretion on clearly untenable grounds or to a clearly unreasonable extent. *Id.* But "[w]e apply a de novo standard of review to claimed violations of the constitutional right to present a defense and the Sixth Amendment right to confrontation." *State v. Montgomery*, 966 N.W.2d 641, 649 (Iowa 2021) (internal citation omitted).

---

[2] By the time of the 2022 trial, S.K. was nineteen years old, S.K. and Fassler were a couple, and they had a child together.

We review challenges to jury instructions, and the refusal to give a requested instruction, for correction of errors at law. *Id.*

We review sufficiency-of-the evidence challenges "'for the correction of errors at law, viewing the evidence in the light most favorable to the State.' This includes making 'legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence.'" *State v. Brown*, 5 N.W.3d 611, 615–16 (Iowa 2024) (citations omitted). Kroll briefly asserts we should change our standard to de novo because sufficiency-of-the-evidence claims "implicate[ ] a constitutional right." Even if we had the authority to overrule decades of supreme court precedent—which we do not, *see State v. Beck*, 854 N.W.2d 56, 64 (Iowa Ct. App. 2014)—we would not do so based on a bare assertion with no supporting legal authority.

Claims of an illegal sentence are reviewed for correction of errors at law. *State v. Petty*, 925 N.W.2d 190, 195 (Iowa 2019).

**III. Analysis.**

**A. Evidence of other sexual relationships.** Before trial, the State filed a motion in limine to exclude all evidence of the victims' other sexual behavior under Iowa Rule of Evidence 5.412 (2022).[3] Rule 5.412 provides:

> a. *Prohibited uses.* The following evidence is not admissible in a civil or criminal proceeding involving alleged sexual abuse:
> (1) Reputation or opinion evidence offered to prove that a victim engaged in other sexual behavior.
> (2) Evidence of a victim's other sexual behavior other than reputation or opinion evidence.

---

[3] Iowa Rule of Evidence 5.412 was amended effective January 1, 2023. We use the prior version as the rule in effect at the time of trial.

b. *Exceptions.*

(1) *Criminal cases.* The court may admit the following evidence in a criminal case:

(A) Evidence of specific instances of a victim's sexual behavior, if offered to prove that someone other than the defendant was the source of semen, injury, or other physical evidence.

(B) Evidence of specific instances of a victim's sexual behavior with respect to the person accused of sexual abuse, if the defendant offers it to prove consent.

(C) Evidence whose exclusion would violate the defendant's constitutional rights.

Kroll asked the court to admit evidence S.K. allegedly lied about several topics relating to her past conduct, arguing the evidence was intended to impeach S.K.'s CAC interview and deposition testimony, and that its exclusion would violate Kroll's constitutional rights. *See* Iowa R. Evid. 5.412(b)(1)(C). The court held a rule 5.412 hearing, where counsel argued, "It's not even necessarily as much about the material that they lied about as the fact that they actually told a lie under oath." The court issued a ruling which excluded under rule 5.412 three of the topics listed by Kroll—including whether S.K. had been truthful regarding sending and receiving nude photos—and determined three other topics were not barred by the rule. The court ruled the evidence relating to the photos "is likely irrelevant and/or collateral to the issues involved in this matter and not otherwise appropriate for use as impeachment, if introduced by [Kroll]."

Kroll raised the issue again at trial and raised it as an error in his post-trial motion for new trial. Each time, the court maintained its ruling.

On appeal, Kroll argues the court "erred by excluding evidence that S.K. . . . had engaged in non-platonic relationships with two adult men." More specifically, he argues the evidence was admissible under rule 5.412 because (1) the evidence

of S.K. sending and receiving nude or partially nude photographs was not "sexual behavior," and (2) even if it was sexual behavior the exclusion violated his confrontation and due process rights.

Our supreme court has explained the purpose and effect of Rule 5.412:

> Iowa Rule of Evidence 5.412, Iowa's rape shield law, prohibits introduction of reputation or opinion evidence of a complaining witness's other sexual behavior and substantially limits the admission of evidence of specific instances of a complaining witness's other sexual behavior. Its purpose "is to protect the victim's privacy, encourage the reporting and prosecution of sex offenses, and prevent the parties from delving into distractive, irrelevant matters." As a result, "[t]he rule presupposes that much evidence which the accused wishes to place before a jury will be excluded."

*Trane*, 934 N.W.2d at 456–57 (footnote and internal citations omitted). The exception under subparagraph (C) that Kroll seeks to invoke "codifies a safety valve to avoid an unconstitutional application of the rape shield rule." *Montgomery*, 966 N.W.2d at 654.

*Sexual behavior definition.* First, we address whether a minor sending and/or receiving nude photographs qualifies as sexual behavior for purposes of rule 5.412(a)(1).

Posing nude is not per se sexual conduct under Iowa case law, as it "does not in and of itself infer or connote sexual activity or conduct." *State v. Zaehringer*, 280 N.W.2d 416, 420 (Iowa 1979). The court went on to say the 1979 equivalent to rule 5.412 did not come into play "[a]bsent a showing or implication of sexual activity of some sort accompanying the posing." In *State v. Alberts*, the supreme court observed, "Just like nudity alone is not sexual, skinny-dipping in and of itself is not sexual behavior," but it could be "deemed sexual behavior based on the

circumstances." 722 N.W.2d 402, 408 (Iowa 2006). Indeed, both parties cite the supreme court's approved definition of sexual behavior as

> a volitional or non-volitional physical act that the victim has performed for the purpose of the sexual stimulation or gratification of either the victim or another person or an act that is sexual intercourse, deviate sexual intercourse or sexual contact, or an attempt to engage in such an act, between the victim and another person.

State v. Baker, 679 N.W.2d 7, 10 (Iowa 2004) (citation omitted).

Kroll sought to introduce evidence[4] that S.K. exchanged nude photographs with two young men to establish their relationships were non-platonic, asserting they fabricated allegations of incestuous sexual abuse because he was attempting to control his daughter's risky behavior and she wanted freedom. Ironically, while Kroll characterizes S.K.'s behavior as "non-platonic" and "risky," he argues it was not "sexual behavior" within the meaning of the rape-shield law.

So we must decide whether S.K.'s alleged act of sending nude photographs by mobile phone through social media was a "physical act that the victim has performed for the purpose of the sexual stimulation or gratification of either the victim or another person" constituting "sexual behavior" as defined in Baker.[5] In

---

[4] The evidence in the record of S.K. sending photographs was limited to exhibits offered at a hearing on motions in limine, including (1) deposition testimony from Bellis that S.K. "maybe" or "probably" sent him nude or topless photos, (2) deposition testimony from Gray that he had seen a topless photo of S.K. on Bellis's phone, and (3) a diary entry about S.K. seeing a photo and receiving a video from another man. The offer of proof was not renewed at trial. Kroll discusses S.K.'s deposition, but no part of that deposition was entered into the record through an offer of proof, so we cannot review it. If there were photos, they no longer exist because they were allegedly sent on Snapchat.

[5] We recognize the mere receipt of such photographs without a corresponding volitional act by the victim (such as requesting or sharing them) would not per se constitute sexual behavior by the victim.

*Alberts*, the defendant sought to enter evidence of a prior false allegation by the victim. 722 N.W.2d at 405. In the prior allegation, the victim asked a man to go skinny-dipping, and thinking she was coming on to him, the man asked for a kiss while they were naked in the river. *Id.* at 408. After she declined the kiss, they held each other in their arms for five minutes until they were interrupted by the brother of the victim's boyfriend. *Id.* at 409. Under these circumstances, the court held the act of skinny-dipping was "sexual behavior" covered by the rape-shield law because it "was likely a precursor to sexual activity." *Id.* Comparably, in *State v. Mayes*, this court determined the act of a minor victim watching a pornographic video shown to her by another adult was a non-volitional physical act falling within "other sexual behavior" again because "it was likely a precursor to sexual activity." No. 19-0252, 2020 WL 2060306, at *5 (Iowa Ct. App. Apr. 29, 2020) (citation omitted). And even if the evidence did not fall within "other sexual behavior," because the pornography was "in and of itself . . . of such a nature that the danger of unfair prejudice outweighs the probative value," it still would have been inadmissible under rule 5.403. *Id.* at *5 n.3.

Likewise, we believe an act of sending nude pictures to men by a mobile device through social media falls within "sexual behavior" because it was likely a precursor to sexual activity between individuals engaged in non-platonic

relationships.[6] This behavior is colloquially known as "sexting."[7] S.K.'s alleged use of Snapchat to send nude photographs was a volitional act "performed for the purpose of the sexual stimulation or gratification of either the victim or another person." *Baker*, 679 N.W.2d at 10 (citation omitted); *accord Mayes*, 2020 WL 2060306 at *4 (citation omitted). There was an "implication of sexual activity of some sort accompanying the posing." *Zaehringer*, 280 N.W.2d at 420. And, it "was likely a precursor to sexual activity." *See Alberts,* 722 N.W.2d at 405; *Mayes*, 2020 WL 2060306 at *5. Under the circumstances of this case, where Kroll wanted to introduce evidence of S.K. allegedly sending nude photographs of herself to teenage boys she was messaging, exchanging nude photos falls within rule 5.412(a)(1) as "other sexual behavior." We reach this conclusion, in part, by considering the purpose of the rule 5.412(a)(1) "which is to protect the victim's

---

[6] We note that a "prohibited sexual act" for supporting a charge of sexual exploitation of a minor includes "[n]udity of a minor for the purpose of arousing or satisfying the sexual desires of a person who may view a visual depiction of the nude minor." Iowa Code §§ 728.1(7)(g), .12(1); *cf. State v. Hunter*, 550 N.W.2d 460, 465–66 (Iowa 1996) (rejecting a constitutional challenge to a charge for sexual exploitation of a minor by use of nude photographs).

[7]
> Sexting has been defined as the practice of sending nude or partially nude photos of oneself or others via text message or mobile phone. "Sexting evolved from adolescents' need to explore their sexuality and the rise in technology that allows them to build sexual relationships via private photographs."
>
> New technology has jump-started sexting among teens and others. Snapchat, a mobile phone application that sends self-destructing messages, has led to the sexting of photos that disappear. . . . This has provided those who are sexting with a comfort level that their images are private and will quickly "disappear," and that no one other than the intended receiver will view them.

Monique C.M. Leahy, *Proof of Sexting Civil and Criminal Liability*, 160 Am. Jur. Proof of Facts 3d 283 § 1 (2017) (footnotes omitted). "Sexting has become today's new first base. It's becoming a part of growing up." *Id.* (cleaned up).

privacy, encourage the reporting and prosecution of sex offenses, and prevent the parties from delving into distractive, irrelevant matters." *See Alberts*, 722 N.W.2d at 409; *see also* Iowa Rs. Evid 5.403 (allowing exclusion of even relevant evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury"), 5.102 ("These rules should be construed so as to administer every proceeding fairly, eliminate unjustifiable expense and delay, and promote the development of evidence law, to the end of ascertaining the truth and securing a just determination.").[8] The district court did not abuse its discretion in excluding evidence of the alleged nude photographs under rule 5.412(a)(1).

*Confrontation and due process claim.* Kroll argues this evidence should have been admitted under the exception in rule 5.412(b)(1)(C) because its exclusion impinged on his right to a fair trial and to confront the witnesses against him. He calls S.K. "uncontrollable," theorizes she only made claims against him because he interfered in what her relationships with adult men, and argues the jury needed "the full context" of her relationships when considering S.K.'s testimony.

"Iowa courts have repeatedly cautioned that an accused does not have a constitutional right to admit evidence of a victim's other sexual behavior that is irrelevant or whose probative value is outweighed by unfair prejudice." 7 Laurie Kratky Doré, *Iowa Practice Series: Evidence* § 5.412:1 (2023 update). "The high

---

[8] Rule 5.102, which is identical to Federal Rule 102, sets forth the general principle of construction to be utilized in applying the Iowa Rules of Evidence. The overriding purpose of the rules, as reflected in Rule 5.102, is to secure fairness in the administration of justice. To this end, the rules are to be liberally construed.
7 Laurie Kratky Doré, Iowa Practice Series: Evidence § 5.102:1 (2023 Update).

bar of the constitutional exception establishes a heightened standard that requires a defendant to show that the 'evidence in question is essential to the presentation of his defense.'" *Id.* (cleaned up). In evaluating whether to admit evidence through the constitutional rights violation exception, the court weighs the defendant's constitutional rights against the State's need "(1) [to] protect the privacy of the victims; (2) [to] encourage the reporting and prosecuting of sex offenses; and (3) to prevent time-consuming and distracting inquiry into collateral matters." *Montgomery*, 966 N.W.2d at 654 (citation omitted). This exception has been applied in the past to "prior false claim[s] of sexual behavior" and concurrent sexual abuse by a family member. *See id.* at 661; *Baker*, 679 N.W.2d at 12.

Excluding evidence—particularly of a contemporaneous sexual relationship with a witness for the State—may present "a misleadingly incomplete picture to the jury." *Montgomery*, 966 N.W.2d at 660. But "evidence can be excluded 'if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.'" *Id.* at 655. And the supreme court observed in a case concerning prior false claims of sexual behavior, "while the complaining witness might have been embarrassed by being shown to be a boaster, or even a liar, about a previous sexual experience, this is not the kind of unfair prejudice that will outweigh the probative value of clearly relevant evidence." *Baker*, 679 N.W.2d at 12.

Kroll's argument centers almost entirely on S.K.'s relationships as the driver behind her allegations. He argues "Bellis was an adult who was involving S.K. in 'sex offenses'" (which his brief identifies as sexual exploitation of a minor and child

pornography by creating the nude or topless photos, possessing them, and showing them to Gray) and that S.K. was angry Kroll called the police on Bellis. He then veers to S.K.'s text messages with Fassler, arguing they were evidence of sexual activity; S.K. and Fassler testified they messaged but did not meet until March of 2019 (after S.K. had reported Kroll). Not only does Kroll argue the excluded evidence would give context to his actions and the conflict between him and S.K., he asserts it was highly relevant for the jury's evaluation of the credibility of S.K., Bellis, Gray, and Fassler. He argues "the jury only heard S.K.'s testimony she told the truth during the interview," despite conflicting testimony in her deposition. As trial counsel put it at the post-trial hearing, the photographs would answer the question of "why would she make this up? The answer is these photographs," and "It's to show [a] pattern of fabrication." Kroll contends the evidence of photographs would allow more pointed impeaching questions of things S.K. and Bellis denied during their testimony and to provide an alternate purpose for the age of consent screenshot.

Yet, Kroll's counsel effectively cross-examined S.K. about inconsistencies with her CAC interview, including S.K.'s denial of a second assault during her interview and a discussion about Kroll's dislike of her talking with Bellis. And counsel was able to highlight discrepancies between S.K.'s deposition and her journal entries about Fassler. For instance, S.K. disclaimed writing portions of the journal entries about wanting to be in a relationship with Fassler and Kroll interfering; but the State stipulated all the entries were written by a single person. The defense was able to impeach S.K.'s general credibility as to her in-court testimony and what was relayed to others, and to raise doubts through S.K.'s

inability or unwillingness to answer questions that might show herself in a bad light, instead claiming to not know or remember many relevant communications. That leaves us with the question whether keeping out the photo and message evidence hampered Kroll's ability to present his defense of a father trying to protect a rebellious daughter, and whether the district court erred when balancing the interests protected by rule 5.412 and Kroll's constitutional rights.

We acknowledge that reference to the nude photographs may have supported Kroll's arguments of fabrication and witness credibility. But we conclude Kroll failed to satisfy the heightened standard that the evidence was essential to the presentation of his defense. S.K. did not make prior false claims of sexual behavior. *See Baker*, 679 N.W.2d at 12. And unlike *Montgomery*, where the State witness was alleged to have contemporaneously sexually abused the child victim in a manner similar to the defendant's alleged abuse, there is no evidence Bellis had sexual relations with S.K. *See* 966 N.W.2d at 658. S.K. had only a virtual relationship with Bellis by phone, text, and alleged nude or topless images over social media. The limited evidence of the photos in the record requires us to follow a speculative chain, starting with Gray's deposition that Bellis identified a topless photo on his phone as S.K., to Bellis's equivocal deposition testimony that S.K. "maybe" or "probably" sent a photo but he could not remember, to S.K.'s denial in her CAC interview of sending photos. The evidence is far from convincing that Bellis was involving S.K. in sex offenses as Kroll claims. At best the evidence shows S.K. was "sexting." And Kroll was able to cross-examine S.K. and Bellis about the extent of their phone calls and text messages without reference to the photographs. Kroll presented effective arguments to the jury about their lack of

credibility as witnesses and their motive to fabricate. The State did not present "a misleadingly incomplete picture to the jury." *See Montgomery*, 966 N.W.2d at 660–61. The probative value of limited evidence S.K. may have sent nude photographs to Bellis on Snapchat was substantially outweighed by the danger of unfair prejudice to the State's need (1) to protect the privacy of the victim; (2) to encourage the reporting and prosecution of sex offenses; and (3) to prevent time-consuming and distracting inquiry into collateral matters. *See id.* at 654; *see also* Iowa Rs. Evid 5.403 (allowing exclusion of even relevant evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury"). Therefore, based upon our de novo review, we conclude exclusion of the evidence of nude photographs did not violate Kroll's constitutional rights.

The district court did not abuse its discretion in excluding the evidence of nude photographs under the rape-shield protections of rule 5.412.

**B. Consent defense instruction.** Relating to the charge of assault causing bodily injury of S.L., Kroll proposed a jury instruction on an exception to assault for voluntary participation:

> An act described in Instructions No. __ shall not be an assault if the person doing any of the enumerated acts, and other such person, are voluntary participants in a sport, social or other activity, not in itself criminal, and such act is reasonably foreseeable incident of such sport or activity, and does not create an unreasonable risk of serious injury or breach of the peace.

Kroll argues this instruction was relevant to a "tickling fight" among S.K., S.L., and S.K.'s brother, in which Kroll joined and touched S.L.'s breast while tickling her. When considering that argument in the context of Kroll's motion for a directed

verdict, the district court observed, "With regard to taking advantage or with regard to the fact that this was just a tickling fight that everyone was involved in . . . an individual cannot just take advantage of that type of situation for their own sexual motivation and in the process commit an assault."

An assault occurs "when, without justification, the person does . . . [a]ny act which is intended to cause pain or injury to, or which is intended to result in physical contact which will be insulting or offensive to another, coupled with the apparent ability to execute the act." Iowa Code § 708.1(2)(a). The statutory exception Kroll seeks to invoke is applied

> [i]f the person doing any of the enumerated acts, and such other person, are voluntary participants in a sport, social or other activity, not in itself criminal, and such act is a reasonably foreseeable incident of such sport or activity, and does not create an unreasonable risk of serious injury or breach of the peace.

*Id.* § 708.1(3)(a).

The State argued the "voluntary participation" instruction and defense does not apply in sexual assault situations and S.L. did not voluntarily participate in the tickle fight with Kroll—he had inserted himself into an already-occurring action. The district court agreed with the State, and relied on parameters referenced in *State v. Collier*, 372 N.W.2d 303 (Iowa Ct. App. 1985), to exclude the instruction. More specifically, the court determined,

> [I]n this case, the tickling and horsing around so to speak, is not the type of social activity that is intended by the legislature to be excluded from being an assault, particularly in this case where there is evidence of some sexual motivation . . . for the acts, and the jury will answer that question as well.
>     So if for some reason the jury were to find it was not sexually motivated, the Court could revisit the issue . . . .

In a special interrogatory, the jury found the assault "was sexually motivated."

In *Collier*, the defendant asserted the assaulted person had "requested him to tie her up to the bed and beat her" as voluntary sadomasochistic activity, so it qualified as "a social activity within the meaning of Iowa Code section 708.1." 372 N.W.2d at 304–05. The *Collier* court observed that section 708.1 did not define what was included in "sport, social or other activity" and determined to use a "sensible, workable, practical, and logical construction . . . avoiding inconvenience or absurdity." *Id.* at 306. The court declined to precisely define the statutory terms but considered it "obvious . . . that the legislature did not intend the term to include an activity which has been repeatedly disapproved by other jurisdictions and considered to be in conflict with the general moral principles of our society." *Id.* at 307. The court noted, "Whatever rights the defendant may enjoy regarding private sexual activity, when such activity results in [assault] of another resulting in bodily injury, such rights are outweighed by the State's interest in protecting its citizens' health, safety, and moral welfare." *Id.* Kroll argues this case is distinguishable from *Collier*, and we should overrule that case and re-interpret Iowa Code section 708.1(3)(a).

Cases subsequent to *Collier* invoking the voluntary-participation exception focused on language that to meet the exception, the act had to be "a reasonably foreseeable incident of such sport or activity." Iowa Code § 708.1(3); *State v. Floyd*, 466 N.W.2d 919, 921–22 (Iowa 1990) (considering an altercation breaking out after official play had ceased at a basketball game); *State v. Vulich*, No. 15-1851, 2017 WL 363234, at *5 (Iowa Ct. App. Jan. 25, 2017) (expressing skepticism an "ice fight" fell within the statutory scope, and certainty a sexual assault with ice cubes was not a reasonably foreseeable incident of an ice fight).

Even if we were to determine a tickle fight falls within the parameters of the statute—a question we do not decide here—we find S.L. did not voluntarily participate in said tickle fight *with Kroll* and his pinning, tickling only her, and then touching her breasts was not a reasonably foreseeable incident to her participation. S.L. was "playing around" with S.K. and N.K.—a peer and young child. Kroll then inserted himself into the tickle fight uninvited, targeted the child he was not related to and had been propositioning, did not stop when she asked him to get off her and leave her alone, and touched her breasts.

Because there is no evidence S.L. voluntarily participated in a tickle fight with Kroll, nor was his pinning and groping her a reasonably foreseeable incident to her actions with S.K. and N.K., we agree with the district court that Kroll was not entitled to the voluntary-participation instruction.

**C. Sufficiency of the evidence.** Kroll next argues that for his conviction for sexual exploitation of a minor[9] (S.L.), the State did not establish Kroll was the Snapchat user messaging S.L. soliciting prohibited sexual contact. He also argues the message allegedly sent does not qualify as "enticing, soliciting, or attempting to cause S.L. to send nude photographs of herself."

S.L. testified she had received a request from Kroll's Snapchat account asking, "Do you send nudes?" She answered no, saying it was gross and he was her friend's dad. He then replied "Do you want to see my cock?" When she said no, he sent a rooster picture. She then blocked all communication channels with

---

[9] The count for sexual exploitation of a minor alleged Kroll "did entice, solicit, or attempt to cause S.L. . . . to engage in nudity of the minor for the purpose of arousing or satisfying the sexual desire of a person who may view" the depiction.

Kroll other than S.K. Kroll told S.L. he had been joking, but S.L. did not believe him.

Kroll asserts the State presented no evidence linking him to the Snapchat account sending the message, either through identification testimony by S.L., a witness who had contacted Kroll through Snapchat, or from the digital forensic examiner who analyzed Kroll's phone.

It is true the State could not produce direct evidence of the message from Kroll's phone at trial. When law enforcement searched Kroll's phone—obtained by warrant in May 2019—it revealed no record of messages or phone calls before February 27, 2019 (the day S.K. was removed from the home), though the phone had been in use since March 2018.[10] The digital forensic examiner testified there were "remnants," including screenshots and temporary and cache files, indicating Snapchat and Facebook had been on the phone at one time, but the apps had been deleted along with the phone's history of calls and text messages. So the State's efforts were hampered by Kroll's destruction or concealment of direct evidence. Yet, "we follow a rule that direct and circumstantial evidence are equally probative for the purposes of proving guilty beyond a reasonable doubt." *State v. Bentley*, 757 N.W.2d 257, 262 (Iowa 2008) (cleaned up).

And there is significant circumstantial evidence from which the jury could infer the message occurred. *See State v. Tipton*, 897 N.W.2d 653, 692 (Iowa 2017) ("A defendant may be convicted solely on circumstantial evidence if it

---

[10] The digital forensic examiner testified to various reasons why there might not be a record on the phone before February 27, 2019, but "[t]he explanation that makes the most sense would be that the older messages were probably deleted" by someone using the phone.

is sufficiently compelling to convince a judge or jury of the defendant's guilt beyond a reasonable doubt.").

S.L. testified she had previously been friends with Kroll on Snapchat, and had changed his name in her contacts so she would know who it was. She noted his username had "snowmobile" in it and was very close to S.K.'s username. S.K.'s Snapchat contacts list included "Dad" with username "snowmobile1981."

Gray testified about having contacted Kroll on at least two different occasions through Snapchat, including to purchase a snowmobile. Gray confronted Kroll on Snapchat about some of his comments about S.L., and Kroll's response was to send him a screenshot about Iowa's age of consent law. Gray did not provide specific account information. The digital forensic examiner testified a screenshot was found on Kroll's phone about Iowa's sexual consent laws—the screenshot was taken December 26, 2018.

The second half of Kroll's argument as to sufficiency of the evidence is that the message "Do you send nudes?" does not qualify as "enticing, soliciting, or attempting to cause S.L. to send nude photographs of herself." Instead, he suggests "It is an inquiry into whether or not S.L. sends nude photos to people." Here, additional context is important, which includes Kroll asking S.L. to "break in" his vehicle and snowmobiles in exchange for driving them, frequent references to her having sex, asking if she wants company in bed, talk about his penis, and making other inappropriate comments.

"In our system of justice, it is the jury's function to determine the credibility of a witness." *State v. Dudley*, 856 N.W.2d 668, 677 (Iowa 2014). And "[t]he jury is free to believe or disbelieve any testimony as it chooses and to give weight to

the evidence as in its judgment such evidence should receive." *State v. Thornton*, 498 N.W.2d 670, 673 (Iowa 1993). Taken as a whole, the circumstantial evidence was sufficient a reasonable jury could conclude beyond a reasonable doubt that Kroll solicited nude photographs from S.L. We affirm his conviction for sexual exploitation of a minor.

**D. Illegal sentence.** Kroll's last claim is the sentencing court did not have the authority to require Kroll to complete a sex offender assessment and recommended treatment. He requests that portion of his sentence be severed and vacated. The State agreed with his assessment and the requested remedy. We agree with the parties the court did not have the authority to require Kroll participate in the assessment or treatment. *See State v. Smith-Berry*, No. 19-0839, 2020 WL 2988410, at *4 (Iowa Ct. App. June 3, 2020). We vacate that portion of the sentencing order and remand for entry of a corrected sentencing order.

**IV. Conclusion**

We find the district court did not abuse its discretion in its application of Iowa Rule of Evidence 5.412. Nor did it err in refusing to include the voluntary participation instruction. Sufficient evidence supports Kroll's conviction for solicitation of a minor. And last, we sever and vacate as beyond the court's authority the portion of Kroll's sentence ordering sex offender treatment and remand for the entry of a corrected sentencing order.

**CONVICTIONS AFFIRMED, SENTENCE VACATED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS.**