# IN THE COURT OF APPEALS OF IOWA

No. 24-1049
Filed July 23, 2025

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**CRAIG LEE ROCKENBACH,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Lee (South) County, Shane M. Wiley, Judge.

A defendant appeals his conviction for voluntary manslaughter. **AFFIRMED.**

Martha J. Lucey, State Appellate Defender, and Theresa R. Wilson, Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Timothy M. Hau, Assistant Attorney General, for appellee.

Considered without oral argument by Tabor, C.J., and Schumacher and Chicchelly, JJ.

**TABOR, Chief Judge.**

A jury convicted Craig Rockenbach of voluntary manslaughter for killing his eighty-four-year-old father.[1]  Rockenbach appeals, challenging the sufficiency of the evidence on two fronts.  First, he argues that the State failed to prove his actions caused or directly contributed to his father's death.  Second, he contends that there was no evidence he was responding to a serious provocation.  He asks that we vacate his conviction and remand for dismissal or for entry of judgment on involuntary manslaughter.  Finding substantial evidence to support causation and no reversible error in the jury's finding of provocation, we affirm.

## I.  Facts and Prior Proceedings

On January 22, 2024, Rockenbach was visiting his parents, Gary and Linda, and his eleven-year-old daughter, I.C., at their home in Keokuk.[2]  Linda wasn't feeling well that afternoon, so Rockenbach, his adult son Owen, and Gary took her to the hospital.  When they returned to the home later that day, Gary, Linda, and I.C. went to the kitchen.  Rockenbach and Owen started wrestling in the living room.  Linda "asked them to leave the house if they were going to fight."  Owen left.  Rockenbach and I.C. asked Linda if they could go get fast food; she said no.

After Linda refused to give her credit card to Rockenbach, he went to the kitchen, picked up a chair, and "threw it on top of Gary," who was sitting at the kitchen table.  I.C. recalled that Gary was "trying to hold on to the chair to . . . protect himself," while Rockenbach "started punching his head."  Linda saw

---

[1] In this opinion, we will refer to the defendant as "Rockenbach" and his parents by their first names.

[2] I.C. had lived with Gary and Linda since she was two years old.

Rockenbach take "a couple swings" at Gary while he was sitting at the table, but she didn't know "if he hit him or not." Then, according to Linda, Rockenbach pulled Gary away from the table to the middle of the kitchen floor, where he struck Gary five times "in the head with both fists, both sides of the head." As Linda recounted, Rockenbach "was bent down over him a little bit, punching like a punching bag."

Linda called 911 twice during the assault. In the recordings of those calls, Rockenbach could be heard yelling, "He's the fucking one that started all this bullshit!" and "You did it, you son of a bitch!" Meanwhile, Linda and I.C. pleaded with Rockenbach to stop. When police arrived, Rockenbach said he "didn't do anything wrong." Gary was lying on the kitchen floor, conscious but disoriented. He had visible injuries on his face, hand, and leg. After calling emergency medical services to help Gary, the police took Rockenbach into custody.

An ambulance took Gary to the hospital, where he was treated and released that night. According to Linda, Gary seemed "okay" when he came home from the hospital, and "he was doing pretty good" the next day. But on January 24—two days after the assault—Gary started complaining of head and neck pain. Linda took him back to the local hospital that afternoon. He was then transferred by ambulance to the University of Iowa Hospital, where his condition continued to worsen until he died on February 1. An autopsy determined that Gary died of complications from bleeding in his brain.

The State charged Rockenbach with murder in the second degree, a class "B" felony, in violation of Iowa Code section 707.3 (2024). He pleaded not guilty. The case went to jury trial in April 2024.

At trial, the State presented the recordings of Linda's 911 calls, the responding officers' body camera footage, photos of Gary's injuries from the evening of the assault, and the autopsy report. The State also presented testimony from Linda, I.C., the responding officers, the medical examiner who performed the autopsy, and Gary's primary medical care provider.

The medical examiner, Dr. Stephanie Stauffer, testified that she determined Gary's cause of death was "complications of intracranial hemorrhages of uncertain etiology." She explained that Gary "had a hemorrhage or bleed within a portion of his brain. That bleed did extend to the space around his brain in two different compartments, and it was essentially medical complications of that that made him die in the setting of some of his other natural diseases . . . ." She also found evidence of blunt force trauma to Gary's face and scalp. And the autopsy revealed that Gary had cerebral amyloid angiopathy, which Dr. Stauffer described as a condition "in which the blood vessels in the brain and sometimes in the tissues around the brain accumulate abnormal protein material within the walls of the vessels and it will cause[] them to be more fragile than a normal blood vessel."

Dr. Stauffer certified the manner of death as "undetermined." She explained:

> Essentially, there were . . . three possibilities for this case and one was that . . . the hemorrhages that he had in his brain, both within the brain and around the brain, were caused by trauma alone.
> Another possibility is that they were caused just by his cerebral amyloid angiopathy.
> The third option is that trauma, even minimal trauma, may have caused his abnormal blood vessels to rupture, and so it would be a combination of those two things, still attributing it to trauma, and the pattern of hemorrhages that he had were not typical for what we often see in trauma alone, which left me with essentially could this be trauma on abnormal blood vessels combined to make this effect

or just the blood vessels themselves spontaneously rupturing. The pattern of hemorrhages could be compatible with that option as well, and because I could not determine with certainty whether this was purely natural phenomenon or possibility of trauma causing or contributing to it, I was left with an undetermined manner.

As for the timing of Gary's death, Dr. Stauffer testified that "trauma-related brain bleeds [can] appear in a delayed fashion," and "an elderly person with fragile blood vessels in the brain [would] be more vulnerable to having a brain bleed as a result of trauma." She did not see any evidence that Gary had prior hemorrhages in his brain. She also noted that Gary was taking anticoagulant medications, "so it's possible that this brain bleed was larger, more extensive or . . . made more severe by the fact that he was on those blood thinners." As her bottom line, Dr. Stauffer testified that Gary would not "have died when he did but for the brain bleed he sustained."

His primary care provider, Beverly Christy, testified that she had regularly seen Gary for the past six years. She last saw him for a routine checkup in December 2023. Christy, a nurse practitioner, knew that Gary had several health conditions, including atrial fibrillation and COPD, and that he took blood thinner medications. But she testified that his overall health was "very good" for his age, he was "still fairly sharp cognitively," and he never had "complaints of any symptoms of anything related to a disorder of the brain."

Rockenbach testified in his own defense. He acknowledged throwing a chair at his father and then hitting him "in the head twice" while he "was on the floor." Yet Rockenbach claimed that he and his father "were getting along okay." And Rockenbach blamed his actions on drinking alcohol while taking an anxiety medication: "I was drunk on a medication that possibly made me hostile."

The jury found Rockenbach guilty of voluntary manslaughter—a lesser included offense of second-degree murder. The district court sentenced him to an indeterminate ten-year prison term. Rockenbach appeals.

## II. Scope and Standard of Review

We review sufficiency-of-the-evidence claims for correction of errors at law. *State v. Cook*, 996 N.W.2d 703, 708 (Iowa 2023). We are bound by the jury's verdict if it is supported by substantial evidence. *State v. Slaughter*, 3 N.W.3d 540, 546 (Iowa 2024). Substantial evidence exists if the record "would convince a rational fact finder the defendant is guilty beyond a reasonable doubt." *State v. Crawford*, 974 N.W.2d 510, 516 (Iowa 2022) (citation omitted). "Evidence which merely raises suspicion, speculation, or conjecture is insufficient." *State v. Casady*, 491 N.W.2d 782, 787 (Iowa 1992). "We consider all evidence, not just the evidence supporting the conviction, and view the evidence in the light most favorable to the State, 'including legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence.'" *State v. Ernst*, 954 N.W.2d 50, 54 (Iowa 2021) (citation omitted).

## III. Analysis

The district court instructed the jury that it could convict Rockenbach of the lesser crime of voluntary manslaughter if the State proved:

> 1. On or about January 22, 2024, the defendant intentionally struck Gary Rockenbach.
> 2. Gary Rockenbach died as a result of being struck by the defendant.
> 3. The defendant's act was done solely by reason of sudden, violent, and irresistible passion resulting from serious provocation.

Rockenbach challenges the State's proof of the second and third elements under that instruction. We will address each claim in turn.

### A. Causation

First, Rockenbach argues that the evidence was insufficient to prove beyond a reasonable doubt that Gary died from the assault. He emphasizes that Dr. Stauffer could not "determine whether Gary's brain bleed came from trauma, his blood vessels rupturing on their own, or a combination of the two." According to Rockenbach, if "the trained medical examiner on the case could not determine whether the assault on Gary led to his death, there is not substantial evidence from which the jury could have done so."

We view the evidence differently. Dr. Stauffer's testimony, along with the circumstances of the brutal assault, could convince a rational jury that Rockenbach's actions caused or directly contributed to Gary's death.[3] *See State v. Burke*, 368 N.W.2d 182, 186 (Iowa 1985) ("[W]hen expert testimony indicating a possibility of causation of a particular condition by a particular circumstance is coupled with nonexpert testimony to the effect that the condition did not exist before the occurrence of the circumstance that allegedly caused it, then a jury question as to causation is generated."); *State v. Bentley*, 757 N.W.2d 257, 262 (Iowa 2008) ("[D]irect and circumstantial evidence are equally probative for the 'purposes of proving guilt beyond a reasonable doubt.'" (citation omitted)).

The jury heard evidence that Rockenbach assaulted Gary on January 22—striking him several times in the head. Gary was eighty-four years old and had

---

[3] The court instructed the jury that "the injuries inflicted by [Rockenbach's] act resulted in" Gary's death if they "caused or directly contributed to" his death.

pre-existing health problems. Still, his primary care provider and family members perceived that he was in good health for his age. Before the assault, Gary had no known history of brain bleeds or symptoms of brain disorders. But unbeknownst to anyone at the time, Gary had cerebral amyloid angiopathy, which made the blood vessels in his brain unusually fragile. He was also taking blood thinner medications, which made him more susceptible to bleeding than an average person. Gary first complained of head and neck pain two days after Rockenbach assaulted him. His condition deteriorated until he died eight days later. And the autopsy showed evidence of blunt force trauma to Gary's face and scalp on top of the bleeding in his brain.

Based on that evidence and reasonable inferences drawn from it, the jury could accept Dr. Stauffer's theory that Gary's fatal brain bleed was caused by trauma alone—the assault by Rockenbach—or a combination of that trauma and his cerebral amyloid angiopathy. Either explanation supports a finding that Rockenbach's actions caused or directly contributed to Gary's death. *See State v. Stendrup*, 983 N.W.2d 231, 242 (Iowa 2022) ("[T]he law imposes no duty on a victim to be in sufficiently good health to withstand a beating . . . . The criminal defendant takes his victim as he finds him."). The jury could also credit Dr. Stauffer's testimony that "trauma-related brain bleeds [can] appear in a delayed fashion"—which would account for the two-day lag between the assault and the onset of Gary's symptoms. While the jury could have accepted Dr. Stauffer's alternative theory that the blood vessels in Gary's brain ruptured "spontaneously," it did not. *See Bentley*, 757 N.W.2d at 263 ("[A] court 'faced with a record of historical facts that supports conflicting inferences must presume . . . that the trier

of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" (citation omitted)). Viewing the record in the light most favorable to the State, substantial evidence supports the jury's finding of causation.

## B. Provocation

Second, Rockenbach contends that the evidence was insufficient because there was no serious provocation—a critical component of voluntary manslaughter.[4] *See* Iowa Code § 707.4; *State v. Ambrose*, 861 N.W.2d 550, 558 (Iowa 2015) ("Provocation is the linchpin of the crime of voluntary manslaughter."). He concedes that Gary did nothing to incite the assault. And he claims that there "was evidence from which the jury could have determined [Rockenbach] essentially blacked out after throwing the chair." So according to Rockenbach, the jury should have returned a not-guilty verdict on voluntary manslaughter and instead convicted him of involuntary manslaughter.[5] *See* Iowa Code § 707.5.

---

[4] The court instructed the jury that

> "serious provocation" is conduct that would cause a reasonable person to have a sudden, violent, and irresistible passion.
>
> Passion is not sudden, violent, and irresistible if there is an interval of time during which a reasonable person would, under the circumstances, have time to reflect and bring her passion under control and suppress the impulse to kill.
>
> Words alone, however abusive or insulting, cannot be serious provocation.

[5] The court instructed the jury that it could convict Rockenbach of the lesser crime of involuntary manslaughter if the State proved:

> 1. On or about January 22, 2024, the defendant recklessly struck Gary Rockenbach.
> 2. The defendant did the act in a manner likely to cause death or serious injury.
> 3. By doing the act, the defendant unintentionally caused the death of Gary Rockenbach.

The State agrees that no evidence of serious provocation was presented at trial.[6] But it insists that the jury's faulty finding of provocation is not reversible error because the evidence was sufficient to convict Rockenbach of second-degree murder. The State is correct.

Voluntary manslaughter "amounts to murder without the ingredient of malice: 'A person commits voluntary manslaughter when that person causes the death of another person, *under circumstances which would otherwise be murder*' if it were not for the existence of provocation." *State v. Taylor*, 452 N.W.2d 605, 606–07 (Iowa 1990) (quoting Iowa Code § 707.4). In other words, provocation is better understood as a partial defense to murder—negating the element of malice—rather than a distinct element of a separate crime. *See id.* at 607; *State v. Williams*, 525 N.W.2d 847, 851 (Iowa 1994) ("[Williams] assumes that provocation is an element of the voluntary manslaughter offense. It is not."); *see also Thompson*, 836 N.W.2d at 477–78 (defendant bears burden of establishing factual basis to submit voluntary manslaughter jury instruction); *State v. Delay*, 320 N.W.2d 831, 834 (Iowa 1982) ("There is no burden on the State to negate an affirmative defense unless the defendant meets his initial burden by producing sufficient evidence that the defense applies."). "For that reason, if the elements of murder are supported by substantial evidence, an erroneous determination that

---

[6] On appeal, the State contends that the district court should not have given the jury a voluntary manslaughter instruction. *See State v. Thompson*, 836 N.W.2d 470, 476–77 (Iowa 2013) ("Lesser offenses must be submitted to the jury as included within the charged offense if but only if they meet both the appropriate legal and factual tests." (citation omitted)). But at trial, neither the prosecutor nor defense counsel objected to that instruction.

provocation exists is not reversible error because it is error that favors the accused." *Williams*, 525 N.W.2d at 851.

The evidence was sufficient to convict Rockenbach of second-degree murder.[7] *See* Iowa Code §§ 707.1, 707.3. Rockenbach admitted that he threw a chair at Gary, then struck him repeatedly in the head while Gary was defenseless on the floor. As we concluded above, substantial evidence supported the jury's finding that Gary died from that assault. The evidence was also adequate to prove that Rockenbach acted with malice aforethought.[8] Linda testified that Rockenbach "was mad or really overly anxious" before he attacked Gary. Similarly, I.C. testified that Rockenbach "started getting, like, really mad" before he threw the chair. I.C. also recalled that Rockenbach was "blaming" Gary "for ruining his life." And during the assault, Rockenbach yelled, "He's the fucking one that started all this bullshit!" and "You did it, you son of a bitch!" while he ignored Linda and I.C.'s repeated pleas for him to stop.

---

[7] The court instructed the jury that it could convict Rockenbach of second-degree murder if the State proved:
> 1. On or about January 22, 2024, the defendant intentionally struck Gary Rockenbach.
> 2. Gary Rockenbach died as a result of being struck by the defendant.
> 3. The defendant acted with malice aforethought.

It also instructed the jury that second-degree murder "does not require a specific intent to kill another person."

[8] The court defined "malice" as "a state of mind which leads one to intentionally do a wrongful act to the injury of another out of actual hatred, or with an evil or unlawful purpose." It defined "malice aforethought" as "a fixed purpose or design to do some physical harm to another which exists before the act is committed."

On this record, the jury's erroneous finding of provocation gave Rockenbach "a break to which he was not entitled." *See Taylor*, 452 N.W.2d at 607. Rockenbach has not established reversible error. So, we affirm.

**AFFIRMED.**